**BUSTOP SHELTERS, INC., Plaintiff,**

v.

**CONVENIENCE & SAFETY CORPORATION, Saul Steinberg, Henry Silverman, Jack E. Bronston, Rosenman, Colin, Freund, Lewis & Cohen, Harrison J. Goldin, Jay Wells, Richard Wells, Jr., and the City of New York, Defendants.**

No. 80 Civ. 6123 (GLG).

United States District Court,
S. D. New York.

Sept. 10, 1981.

Windels, Marx, Davies & Ives, New York City, for plaintiffs; Paul Windels, Jr., Raymond T. Munsell, Anthony A. Dean, E. Miles Prentice, III, Cynthia A. Clark, New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for defendants Convenience & Safety Corp., Saul Steinberg and Henry Silverman; Chester J. Straub, Lawrence O. Kamin, David G. Trachtenberg, New York City, of counsel.

Warshaw, Burstein, Cohen, Schlesinger & Kuh, New York City, for defendant Jack E. Bronston, Richard H. Kuh, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendant Rosenman, Colin, Freund, Lewis & Cohen; Robert P. Patterson, Jr., Frederick T. Davis, Christine H. Miller, Leslie C. Levin, Arnold I. Roth, Alan L. Doochin, New York City, of counsel.

Allen G. Schwartz, Corp. Counsel, New York City, for defendants City of New York, Harrison J. Goldin and Richard Wells, Jr.; Doron Gopstein, Richard Higgins, Isaac Klepfish, New York City, of counsel.

Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for defendant Jay Wells; Matthew Silverman, George B. Yankwitt, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

This antitrust action (with pendent state law claims) concerns the much publicized, much litigated, and much investigated competition for the bus stop shelter franchise in New York City. A brief outline of the facts and the previous litigations will suffice for the purpose of deciding the instant motions to dismiss.

*Facts*

In 1974, the plaintiff, BusTop Shelters, Inc. ("BusTop"), approached New York City Officials with a proposal for the building and maintaining of bus stop shelters on City sidewalks by BusTop. The proposed flat-topped glass and steel shelters were to be enclosed on two or three sides, serving as protection for the waiting bus passengers and as a source of advertising revenues for the owners. After lengthy negotiations, in 1975, the New York City Board of Estimate [1] awarded BusTop a three-year experimental franchise to build and maintain hundreds of shelters on City sidewalks in Manhattan and the Bronx [2] in exchange for payment to the City of a percentage of the advertising revenues earned.

During the next three years, BusTop built and operated approximately 500 shelters,[3] apparently with surprising success in terms of acceptance by advertisers and by the public. In the hope of securing a long-term franchise at the end of the three-year period, BusTop began to search for additional capital. Among those with whom investment in BusTop was discussed were defendants Saul Steinberg and Henry Silverman.

Meanwhile, BusTop continued to press the City for the award of the long-term franchise. In October 1977, the Board of Estimate preliminarily approved the franchise. Thereafter, final approval was postponed, the City having been approached by other possible applicants for the franchise. In May 1978, the Board of Estimate directed the Bureau of Franchises to issue a Request For Proposals opening up the bidding for the franchise. Four proposals were submitted, including one from BusTop, and the Board of Estimate accepted one of them—not BusTop's proposal, but that of defendant Convenience & Safety Corporation ("C&S"), a corporation formed in 1977 by Saul Steinberg and Henry Silverman.[4]

BusTop's interim franchise expired in September 1978. In November, the Board of Estimate directed BusTop either to convey the existing shelters to the City or to remove the shelters and restore the sidewalks to their original condition, as provid-

---

1. The Board of Estimate is a policy-making body in the government of New York City. Its members include the Mayor, the Comptroller, the President of the City Council, and the presidents of the five boroughs of the City—all elected City officials. Among its powers is the exclusive power to grant franchises for the use of the City's streets. New York City Charter § 362. The Bureau of Franchises, headed by an appointee of the Board of Estimate, receives petitions for franchises and makes recommendations to the Board. Franchises must be approved by a three-quarters vote of the Board. The Mayor has veto power. New York City Charter § 373.

2. BusTop had asked for a twenty-year franchise, but the City had refused to grant it, because of concern about repeating the prob-

lems it had experienced in the past with franchises and because of concern about the viability of the bus shelter proposal. *See City of New York v. BusTop Shelters, Inc.*, No. 40366/79, slip op. at 3 (Sup.Ct.N.Y. County Mar. 26, 1979) (Kassal, J.).

3. Under the terms of the contract, BusTop was supposed to build at least 900 shelters. The City and BusTop disagree on the reasons for the failure to build the minimum number. BusTop contends the reason was administrative delays on the part of the City. The City contends the failure resulted from BusTop's deficiencies.

4. The Mayor, however, did not give his required approval to that award.

ed for in the interim franchise.[5] BusTop refused to comply. By that time, the litigation and the investigations[6] had already begun, and they have continued to the present time.

*Previous State Litigation*

The first litigation was an Article 78 proceeding brought by BusTop in New York State Supreme Court for review of the action of the Board of Estimate in directing the issuance of the Request For Proposals. BusTop alleged that the terms of the Request For Proposals included "extraordinary requirements" that were drafted by the Comptroller's Office so as to eliminate Bus-Top from the competition for the franchise and to "construct a sweetheart contract for a competitor ... of BusTop"—C&S. On October 17, 1978, Justice Ascione dismissed the petition, ruling that there was a reasonable basis for the Board of Estimate's actions and that the petitioner had failed to show that there was any arbitrary and capricious action on the part of the Board. *See BusTop Shelters, Inc. v. City of New York*, 99 Misc.2d 198, 415 N.Y.S.2d 726 (Sup. Ct.N.Y. County 1978).

The second action was brought by Bus-Top against the City of New York and Harrison J. Goldin, Comptroller of the City of New York. This time, BusTop sought equitable relief granting it the twenty-year franchise it asserted it deserved, on the grounds of, *inter alia*, an alleged "fiduciary relationship" between it and the City and alleged wrongdoing by Goldin in inducing the Board of Estimate to fail to complete its agreement with BusTop for a long-term franchise. On April 2, 1979, Justice Stecher dismissed the action, finding that BusTop failed to allege facts demonstrating arbitrariness or an abuse of discretion, that BusTop had no rights to a long-term franchise, and that Goldin was not personally liable for his discretionary acts as Comptroller. *See BusTop Shelters, Inc. v. City of New York*, Nos. 41946/78 & 14424/78 (Sup.Ct. N.Y. County Apr. 2, 1979).

The third action was brought by New York City against BusTop, seeking to exercise its option under the interim franchise to buy the existing shelters or have BusTop remove them. C&S intervened in that action as a plaintiff, and BusTop eventually asserted seventeen affirmative defenses and two counterclaims. After two hearings and two opinions on the City's motions for preliminary injunctions and BusTop's motion to dismiss, Justice Kassal granted the motions of the City and C&S for summary judgment in a twenty-two-page opinion issued on September 3, 1980. Justice Kassal rejected all of BusTop's affirmative defenses except the one that alleged violations of the antitrust laws. While noting that two New York State Supreme Court justices had previously found the allegations of conspiracy included in the antitrust charges "not supported by the facts" and that "Bus-Top has not established any additional facts of such a conspiracy at this time," Justice Kassal did not reach the merits of the antitrust issue and dismissed without prejudice BusTop's counterclaims, which also consisted of allegations of antitrust violations. *See City of New York v. BusTop Shelters, Inc.*, No. 40366/79 (Sup.Ct. N.Y. County Sept. 3, 1980). Justice Kassal's granting of summary judgment was affirmed by the

---

5. The interim franchise provided:

19. Upon termination of this consent by expiration of term, without cause, the City shall have the option to either (a) purchase from the Company the then existing bus stop shelters at book value (book value shall mean the cost of construction of the bus stop shelters, less depreciation on a straight line basis using an annual rate of depreciation of 10%), or (b) direct the Company to remove the bus stop shelters and restore the respective sidewalks and curbs to their proper and original condition within thirty (30) days, at the Company's own cost and expense; ...

6. Both New York City and the federal government conducted investigations of the BusTop controversy. Both are now completed. The federal investigation resulted in charges of mail fraud being brought against Jack E. Bronston (a State Senator and attorney who aided C&S at the same time his law firm was representing (BusTop), for which he was convicted in October 1980. *United States v. Jack E. Bronston*, 491 F.Supp. 593 (S.D.N.Y.1980), *aff'd*, 658 F.2d 920 No. 81–1015 (2d Cir. Aug. 19, 1981).

Appellate Division, First Department, and the Court of Appeals denied leave to appeal.

*The Complaint*

In October 1980, after it had pressed its claims without success in all three state actions, BusTop brought the instant action in federal court. BusTop's complaint lists six causes of action, alleging: 1) violations of section 1 of the Sherman Act, 15 U.S.C. § 1; 2) violations of section 2 of the Sherman Act, 15 U.S.C. § 2; 3) violations of New York State's antitrust statute, the Donnelly Act, N.Y. Gen.Bus.Law § 340 et seq.; 4) fraud in BusTop's being deprived of independent legal representation; 5) fraud and breach of fiduciary duty; and 6) negligence.

The factual allegations of the defendants' wrongdoing that BusTop makes in support of its claims may be outlined as follows:

1) Defendant Jack E. Bronston, a partner in defendant law firm Rosenman, Colin, Freund, Lewis & Cohen ("the Rosenman firm"), wrote a letter to defendant Richard Wells, Jr., Executive Assistant to Comptroller Harrison J. Goldin, stating that approval of BusTop's long-term franchise " 'would not appear to be in the public interest.' " ("The letter indicated familiarity with information furnished by BusTop to the Rosenman Firm as counsel for the new investors in BusTop," but was written on time charged to C&S, whom Bronston was representing, unbeknown to the BusTop investors who had retained the Rosenman firm.)[7]

2) An audit favorable to BusTop prepared in the Comptroller's office "was suppressed," and an audit critical of BusTop, which was "made without supporting documentation by personal appointees of Goldin," was "released to the public."

3) Goldin used the unfavorable report and "a misleading press release purportedly based thereon" to induce the Board of Estimate to defer final approval of BusTop's franchise and to award the long-term franchise to C&S.

4) The defendants schemed to include "excessive bonding requirements and fictitious specifications" in the Request For Proposals, "whereby it was made to appear that C&S sponsored a program more favorable to the City."

5) At a meeting in May 1978 with defendant Steinberg and defendant Jay Wells, Goldin solicited funds for his election campaign for the office of state comptroller, and Steinberg agreed to contribute $25,000. ("In June 1978 Bronston received a personal check for $12,500 from Steinberg. On or about July 11, 1978, Bronston made a $3,500 contribution to Goldin's campaign fund.")

6) The City "purported to exercise" its option to purchase BusTop's existing shelters or require BusTop to destroy them.

7) The City "sought to force BusTop to sell its business in the City to C&S."

8) "C&S demanded BusTop's business at a fraction of its value, stating that its purpose was to eliminate BusTop as a competitor."

9) The City "initiated litigation to force BusTop to remove its shelters."

The complaint then sums up its allegations by stating that defendants C&S, Steinberg, Silverman, Bronston, the Rosenman Firm and Wells, Sr. [Jay Wells] combined and conspired and entered into agreements and understandings for the purpose of causing the City to grant a long-term bus shelter franchise to C&S rather than BusTop."

The defendants have now submitted several motions to dismiss the action. Since BusTop does not allege diversity of citizenship as a basis for jurisdiction, its antitrust claims, which are its only federal question causes of action, are essential to the maintenance of the action in federal court. Thus, the first step in analyzing the sufficiency of the complaint is consideration of the antitrust causes of action. An examination of the complaint reveals serious difficulties with the antitrust claims.

---

**7.** All quotations in this list of allegations are from BusTop's complaint.

### The Noerr-Pennington Doctrine

The first problem with BusTop's antitrust claims is that they appear to fall within the exemption from the antitrust laws created by the *Noerr-Pennington* Doctrine. The *Noerr-Pennington* doctrine takes its name from two Supreme Court cases, *Eastern Railroad Presidents Converence v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

In *Noerr*, the Supreme Court stated the basic principle "that no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135, 81 S.Ct. at 528. The Court then held that the activities of twenty-four railroads, an association of their presidents, and a public relations firm in conducting a publicity campaign against long-distance truckers did not violate the Sherman Act, because those activities consisted of "efforts to influence the passage and enforcement of laws." *Id.* at 142, 81 S.Ct. at 532. The Court so held despite its explicit recognition of findings below "that the railroads' sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long-distance freight business," *id.* at 138, 81 S.Ct. at 530; that the railroads' activities involved " 'deception of the public, manufacture of bogus sources of reference [and] distortion of public sources of information,' " *id.* at 140, 81 S.Ct. at 531; and "that the railroads' campaign was intended to and did in fact injure the truckers in their relationships with the public and with their customers." *Id.* at 143, 81 S.Ct. at 532.

The *Pennington* case concerned, *inter alia,* allegations that the United Mine Workers union and certain large coal companies had conspired to persuade the Secretary of Labor and the Tennessee Valley Authority to take certain actions that would make it "difficult for small companies to compete" in a certain market. The Court held that "[j]oint efforts to influence public officials" were shielded from the Sherman Act even if they were "part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.

██ If BusTop's allegations are assumed to be true, as they must be on a motion to dismiss, *see, e. g., Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 388 (1976), they nevertheless seem to fall squarely within the antitrust exemption carved by *Noerr* and *Pennington.* The specific acts of which BusTop complains, as outlined above, consist of alleged pressure on governmental officials, such as writing a letter to a governmental official and scheming to have certain provisions included in a government document, as well as the actions allegedly taken by governmental officials in response to that pressure, such as suppressing one audit while airing another and denying a franchise to one company while awarding it to another. In the language of the complaint, the offending conduct was combining and conspiring "for the purpose of causing the City to grant a long-term bus shelter franchise to C&S rather than Bus-Top." Nothing could be more clearly a joint effort to influence public officials, which is precisely what *Noerr* and *Pennington* exclude from the coverage of the Sherman Act.

BusTop, however, contends that the acts of the defendants in the instant action fall within the "sham exception" to the *Noerr-Pennington* doctrine. The sham exception was first stated in *Noerr* itself:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices.

365 U.S. at 144, 81 S.Ct. at 533. The Supreme Court elaborated on the sham excep-

tion in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), which concerned an alleged conspiracy by truckers "to institute state and federal proceedings to resist and defeat applications by [competitors] to acquire operating rights or to transfer or register those rights." *Id.* at 509, 92 S.Ct. at 611. The Court first held that the *Noerr-Pennington* doctrine applied to efforts to influence administrative agencies and courts as well as attempts to influence legislative and executive actions, *id.* at 510, 92 S.Ct. at 611, but then delineated an exemption from antitrust immunity for efforts "to harass and deter [competitors] in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals." *Id.* at 511, 92 S.Ct. at 612.

The conduct complained of in the instant action is distinguishable from that exempted from the application of the *Noerr-Pennington* doctrine in *California Motor Transport* in at least three ways. First, the governmental body that was the object of the alleged influence and pressure here was not an administrative or judicial body, but the Board of Estimate, which is composed of the highest elected executive and legislative officials in the City.[8] Second, in the instant case, there is no allegation that BusTop was denied "free and unlimited access" to governmental officials. The complaint is, rather, that others also had access to those officials and exploited it improperly. Third, the attempt to influence governmental officials in the instant case was no sham. It may have been improper, but it was clearly an example of a "genuine effort to influence" official action, which the Court in *Noerr* found squarely within the antitrust immunity. 365 U.S. at 144, 81 S.Ct. at 533. In contrast, in *California Motor Transport,* there were no allegations "that the conspirators 'sought to influence public officials.'" 404 U.S. at 512, 92 S.Ct. at 612.

BusTop emphasizes the passage in *California Motor Transport* condemning such conduct as perjury of witnesses, anticompetitive use of a patent obtained by fraud, and bribery of a public purchasing agent. *See id.* at 512–13, 92 S.Ct. at 612–613. At that point, however, the Court was explicitly referring to "the setting of the adjudicatory process," *id.* at 512, 92 S.Ct. at 612, except in the bribery example, which was mentioned as a specific violation of section 2(c) of the Clayton Act, not of the Sherman Act. As this Court reads *California Motor Transport,* the key to the sham exception, as outlined there, is barring a competitor "from meaningful access to adjudicatory tribunals...." *Id.* BusTop's interpretation would seem to be inconsistent with *Noerr,* in which the Court, as has already been noted, found the unethical character of the conduct involved "legally irrelevant" to the application of antitrust immunity. 365 U.S. at 142, 81 S.Ct. at 532. Furthermore, other courts have subsequently so interpreted *California Motor Transport. See, e. g., Miracle Mile Associates v. City of Rochester,* 617 F.2d 18, 21 (2d Cir. 1980); *Reaemco, Inc. v. Allegheny Airlines,* 496 F.Supp. 546, 556 (S.D.N.Y.1980); *Wilmorite, Inc. v. Eagan Real Estate, Inc.,* 454 F.Supp. 1124, 1131, 1134–35 (N.D.N.Y.1977), *aff'd mem.,* 578 F.2d 1372 (2d Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978).

A case very similar to the instant one is *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir. 1975), in which an unsuccessful applicant for a cable television franchise sued the successful applicant, its owners and officers, and certain city officials. The complaint included allegations that officers of the owner of the successful applicant had made campaign contributions to the mayor and an alderman of the city in order to induce them to oppose the plaintiff's application for the franchise and persuade the city council to award the franchise to the defendant applicant. The court noted: "Unlike the injury to plaintiffs in *California Motor Transport,* the injury to plaintiff in the case at bar was caused by the governmental actions of the city council which the defendants genuinely and suc-

---

8. *See* note 1 *supra.*

cessfully attempted to induce the city council to take." 516 F.2d at 229. The court ruled that the campaign contributions and the "defendants' use of misrepresentations as a part of their efforts to induce governmental action" did not bring the conduct within the Sherman Act. *Id.* at 230–31. The court also distinguished *California Motor Transport* on the issue of adjudicatory rather than legislative setting, *id.* at 232, and affirmed the dismissal of the complaint.

BusTop argues that *Metro Cable* is wrongly decided and relies on other cases, such as *Kurek v. Pleasure Driveway and Park District of Peoria, Illinois*, 557 F.2d 580 (7th Cir. 1977), *vacated and remanded,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *on remand*, 583 F.2d 378 (7th Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); *Duke & Co. v. Foerster*, 521 F.2d 1277 (3d Cir. 1975); *Woods Exploration & Producing Co. v. Aluminum Company of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *George R. Whitten, Jr., Inc. v. Paddoch Pool Builders, Inc.*, 424 F.2d 25 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970); *Harman v. Valley National Bank*, 339 F.2d 564 (9th Cir. 1964). It should be noted, however, that *Metro Cable* has been cited with approval in this circuit, *see, e. g.*, *WIXT Television, Inc. v. Meredith Corp.*, 506 F.Supp. 1003, 1032 (N.D.N.Y.1980), whereas the cases cited by BusTop are either distinguishable or disapproved in this circuit.

*Kurek, supra,* and *Duke & Co., supra*, are distinguishable. First, they are concerned primarily with the antitrust immunity of governmental entities, *see Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), rather than that of private parties seeking to influence governmental entities. Their concern with the *Noerr-Pennington* doctrine is secondary to their concern with the *Parker* doctrine, and they have been cited primarily for their application of the *Parker* doctrine. Second, those cases involved a different type of governmental body—for example, a park district that owns and operates municipal golf courses, rather than a legislative or executive body, such as the Board of Estimate.

*Woods Exploration & Producing Co., supra,* and *George R. Whitten, Jr., Co., supra*, have been disapproved in this circuit, as implicitly overruled or weakened by *California Motor Transport.*[9] *See Reaemco, Inc. v. Allegheny Airlines, supra*, 496 F.Supp. at 556 n.6. *Accord, Wilmorite, Inc. v. Eagan Real Estate, Inc., supra*, 454 F.Supp. at 1131–32 (with regard to *Woods Exploration & Producing Co.*). *Harman v. Valley National Bank, supra*, was criticized in *Sun Valley Disposal Co. v. Silver State Disposal Co.*, 420 F.2d 341, 342–43 (9th Cir. 1969), as inconsistent with *Pennington.*

This Court finds the reasoning of *Metro Cable* both consistent with the Supreme Court's opinions in *Noerr, Pennington*, and *California Motor Transport* and highly persuasive in the instant case, given the similarity of the fact patterns in the two cases.[10] Accordingly, BusTop's first two causes of action should be dismissed for failure to state a claim under the Sherman Act.

---

**9.** BusTop also relies on *Woods Exploration & Producing Co.* and *George R. Whitten, Jr., Co.* in its argument that the *Noerr-Pennington* immunity is narrowly circumscribed when the government participates in the commercial activity in question. As has been noted, however, these cases have been criticized in this circuit. Moreover, such an argument seems inconsistent with *Pennington*, which involved government purchases of coal—certainly a commercial activity. Finally, the granting of a franchise by a government is not a commercial activity but, rather, a sovereign act.

**10.** Obviously, a ruling that the conduct here is immune from the application of the antitrust laws implies no approval of that conduct or any immunity from the application of other laws, such as those that address political corruption. *See Metro Cable*, 516 F.2d at 231. *Accord, Noerr*, 365 U.S. at 140–41, 145, 81 S.Ct. at 531, 533. Rather, it implies recognition of the maxim that "[t]he antitrust laws were never meant to be a panacea for all wrongs." *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).

## Injury to Competition

Even if the allegations in the antitrust causes of action did not fall within the antitrust immunity of the *Noerr-Pennington* doctrine, this action would have difficulty surviving a motion to dismiss. A few words should be said about some of the other deficiencies in the complaint. One deficiency is the failure to allege injury to competition adequately.

BusTop does not make clear in its complaint—or even in its memorandum of law opposing the motions to dismiss—exactly what its antitrust theory is. Whatever the theory, however, antitrust injury must be alleged.[11] And antitrust injury is injury to competition generally, not injury to one competitor. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

The complaint vigorously alleges injury to the plaintiff resulting from its being deprived of the bus stop shelter franchise. But the granting of an exclusive franchise, in itself, is not illegal, even though it, of necessity, excludes competitors from a certain market. *United States v. Yellow Cab Co.*, 332 U.S. 218, 229, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010 (1947). In any event, since BusTop was seeking the franchise also, it can hardly complain about the granting of such a monopoly. (Ironically, one of the principal acts BusTop complains of was the opening of the bidding on the franchise and the receipt of competing bids. It is hard to see how that conduct can be called anticompetitive.) Moreover, the granting of the franchise to C&S and the other alleged acts of the defendants injured only BusTop, if anyone.

The only allegations of injury to competition generally are that "BusTop has been forced to abandon or indefinitely postpone most of its plans and negotiations for contracts to construct and operate shelters in other cities;" that "BusTop has been virtually eliminated as an innovative and competitive force in the bus shelter market"; and that "competition in the bus shelter market has been eliminated and destroyed; interest in and financing for bus shelters throughout the United States has been reduced or eliminated; and the taint of political scandal has cast a cloud over the development of the entire market." There is no suggestion of supporting facts, such as the size of the relevant product and geographic markets, the amount of competition foreclosed, and how the acts of the defendants affected that competition. Such conclusory allegations are insufficient in an antitrust complaint. *See, e. g., Petroleum for Contractors, Inc. v. Mobil Oil Corp.*, 1978–2 Trade Cas. (CCH) ¶ 62,151, at 75,082 (S.D.N.Y. July 5, 1978).

Even if the allegations of the complaint were sufficient to make out an antitrust cause of action, there is another reason why the complaint should be dismissed. Much of what BusTop alleges as the wrongful acts of the defendants has already been litigated in the three actions in the courts of New York State discussed at the beginning of this opinion. Even though those courts did not consider the antitrust claims presented in the instant complaint, they did

---

11. BusTop attempts to avoid the need to allege injury to competition by arguing that the defendants' conduct constituted a *per se* violation of the antitrust laws. The Court fails to discern, however, what *per se* theory could be applied to these allegations. Exclusive franchises are tested under the "rule of reason," for which injury to competition must be alleged. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841–42 (2d Cir. 1980). Group boycotts, which BusTop suggests as a theory, are often considered under the *per se* rule, but not in the context of a vertical refusal to buy or sell, such as that alleged here. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). *See also Sitkin Smelting & Refining Co. v. FMC Co.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978) (*per se* rule not applicable to situation of sham bidding); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 77–80 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (*per se* rule not applicable in exclusive distributorship case.)

**998**

consider and decide, in the context of other legal theories, many of the issues now presented as the basis for antitrust claims. For example, all three courts decided in one way or another that the Board of Estimate acted reasonably and not arbitrarily or illegally in issuing the Request For Proposals. No purpose would be served in allowing BusTop to litigate those issues yet again, and the decisions of the New York State courts should be given collateral estoppel effect as to those issues. *See Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Winters v. Lavine*, 574 F.2d 46 (2d Cir. 1978). Without them, very little of the already inadequate complaint remains.

*Dismissal of the Complaint*

BusTop's previous opportunities in the state courts to litigate the issues that form the basis for its antitrust claims suggest the futility of further pleading and make dismissal of the causes of action without leave to replead particularly appropriate. Moreover, the *Noerr-Pennington* doctrine's purpose of protecting First Amendment values supports dismissal at the pleading stage. *Wilmorite, Inc. v. Eagan Real Estate, Inc., supra*, 454 F.Supp. at 1137; *Mountain Grove Cemetery Ass'n v. Norwalk Vault Co. of Bridgeport, Inc.*, 428 F.Supp. 951, 956 (D.Conn.1977).

On dismissal of the federal antitrust claims, the pendent state claims must also be dismissed, since the basis for this Court's jurisdiction over them has been removed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, the defendants' motions are granted, and the complaint is dismissed in its entirety.

SO ORDERED.