J & J CONSTRUCTION COMPANY v BRICKLAYERS AND ALLIED
CRAFTSMEN, LOCAL 1

Docket No. 215090. Submitted December 11, 2000, at Detroit. Decided
May 11, 2001, at 9:10 A.M. Leave to appeal sought.

J & J Construction Company brought an action in the Wayne Circuit
Court against Bricklayers and Allied Craftsmen, Local 1 and Mark
King, alleging defamation and tortious interference with a business
expectancy after the plaintiff's bid for masonry work at the Wayne
Aquatic Center was rejected by the Wayne city council after King, a
business agent of the bricklayers' union, told the council that the
plaintiff did not share the city's prounion sentiment, did not pay the
prevailing wage as required under the prevailing wage act, had
poor workmanship, and could not complete projects on time. Fol-
lowing a bench trial, the court, Robert L. Ziolkowski, J., entered a
judgment for the plaintiff with respect to both claims and awarded
it lost profits from the rejected bid, costs, attorney fees, and inter-
est. The defendants appealed.

The Court of Appeals *held*:

1. The trial court erred in finding the defendants liable for tor-
tious interference with a business expectancy. The defendants were
exercising their First Amendment right to petition government
when persuading the city council not to award the masonry con-
tract to the plaintiff. Their use of misleading statements about the
plaintiff in the course of petitioning the city council cannot, under
the *Noerr-Pennington* doctrine, give rise to liability for tortious
interference with a business expectancy. Pursuant to *Eastern Rail-
road Presidents Conference v Noerr Motor Freight, Inc*, 365 US
127; 81 S Ct 523; 5 L Ed 2d 464 (1961), and *United Mine Workers of
America v Pennington*, 381 US 657; 85 S Ct 1585; 14 L Ed 2d 626
(1965), First Amendment petitioning of government is generally
protected from claims brought under federal and state laws, includ-
ing common-law tortious interference with contractual relations.

2. The plaintiff's action against the defendants is not preempted
by the National Labor Relations Act (NLRA), 29 USC 141 *et seq.*,
which confers broad exclusive jurisdiction on the National Labor
Relations Board (NLRB) to resolve labor disputes. The defendants
did not engage in any unfair labor practice, as defined in 29 USC

158(b)(4), in speaking to the council against the award of the contract to the plaintiff in such a manner that the plaintiff's claims against the defendants constituted a labor dispute that is within the exclusive jurisdiction of the NLRB.

3. The First Amendment right to petition government is not absolute in that a petitioner who makes defamatory statements about a private figure remains liable for defamation if the petitioner made the statements with actual malice, i.e., with knowledge of their falsity or with reckless disregard for their truth or falsity. In this case, the trial court, in determining that the defendants were liable for defamation, found ordinary negligence by the defendants. The case must be remanded for a redetermination of the defendant's liability for defamation under the actual malice standard.

Reversed in part and remanded.

TORTS — CONSTITUTIONAL LAW — PETITIONING GOVERNMENT.

A person who speaks to government officials against an award of a competitively bid contract to a private figure is engaged in the exercise of the First Amendment right to petition government; when the contract is not awarded to the private figure, false or misleading statements made by the petitioner to government officials about the private figure do not give rise to liability for tortious interference with a business expectancy but may give rise to liability for defamation if the statements were made with knowledge of their falsity or with reckless disregard for their truth or falsity (US Const, Am I).

*Brady Hathaway, P.C.* (by *Daniel J. Bretz* and *David A. Hardesty*), for the plaintiff.

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Ellen Gurewitz* and *Marshall J. Widick*), for the defendants.

Before: MCDONALD, P.J., and NEFF and FITZGERALD, JJ.

FITZGERALD, J. Defendants, Bricklayers and Allied Craftsman, Local 1 (the union), and Mark King, one of its representatives, appeal as of right a judgment in favor of plaintiff, J & J Construction Company, after a bench trial involving claims of defamation and inter-

ference with a business expectancy. Plaintiff was awarded $57,888 in damages, $104,286.95 in costs and attorney fees, and $26,044.51 in interest. We reverse in part and remand.

The material facts are not in dispute. In 1995, the city of Wayne solicited bids for the construction of the Wayne Aquatic Center and plaintiff submitted the lowest bid for the masonry contract. Defendant King, acting as business agent for the union, appeared before the city council and expressed doubts concerning whether plaintiff performed quality work or paid the prevailing wage, leading the council to award the contract to another bidder.

The Wayne city attorney testified that, as a matter of municipal law, the city was obligated to award contracts to the lowest qualified bidder meeting specifications unless the city council determined that the public interest would be better served by accepting a higher bid. At the city council meeting in May 1995, defendant King spoke on the subject of plaintiff and indicated that plaintiff did not pay the prevailing wage and had poor workmanship. King also showed some photographs supposedly depicting plaintiff's work. The council voted to table the contract and voted the following month to reject plaintiff's bid because of concerns about faulty workmanship and failure to pay prevailing wage and benefits.

Defendant King testified that he was as knowledgeable in the bricklaying trade as the average bricklayer. In March 1995, he took photographs of plaintiff's work at Novi High School for the purpose of showing

shortcomings in craftsmanship. These photographs were shown to the Wayne city council. In the pictures, he was trying to show an inconsistency in the sizes of the joints in the locker room wall, which King regarded as indicative of poor workmanship. Another photograph taken at Novi High School was described as showing work that was "really terrible," "a cardinal sin" in bricklaying. King offered further technical descriptions of supposed deficiencies that he detected in that job.

King testified that, at the city council meeting, he stated that plaintiff lacked the ability to do to the job for which plaintiff was bidding, and also that plaintiff might be unable to complete the work in a timely manner. King additionally testified that he commented that plaintiff "is a non-union contractor and this is a union town."

Concerning the basis for his suggestion that plaintiff might not be able to complete the job on time, King described jobs where plaintiff was obliged to engage subcontractors in order to meet a deadline. King conceded that he knew of no job that plaintiff had not finished on time.

King agreed that prevailing wages and benefits were set by the state of Michigan and that, when he suggested to the city council that plaintiff did not comply with the prevailing wage act, the only related documentation he had in his possession was certified payrolls from plaintiff stating that plaintiff had in fact complied as concerned the Novi job. King stated that he had not checked with the state, or with any official involved in the Novi job, to verify the matter. However, King testified that he spoke with two of plaintiff's bricklayers, who said that plaintiff did not pay

benefits, but that upon talking to one of them a second time he did learn that insurance coverage began after sixty days on the job. King conceded that the sixty-day waiting period for insurance was shorter than the six hundred working hours for which a union contractor had to wait. He also conceded that, despite the certified payrolls indicating that plaintiff pays benefits and statements from the bricklayers that they were going to get benefits, he still informed the city council that plaintiff does not comply with the prevailing wage law.

On cross-examination, King testified that he knew from experience that contractors' certified payroll statements did not always accurately reflect the actual practices. King explained that "pensions, holiday pay, stuff along that line" contributed to the prevailing wage calculation, and that he did not believe that health insurance coverage combined with $23 an hour added up to the prevailing wage in this instance.

George Hamlin testified that, during 1994-95, he was senior superintendent for Barton Mallow, a company of construction managers, and that he had served as senior superintendent for the Novi High School job. Hamlin confirmed that plaintiff was the masonry contractor for the job. Hamlin stated that he had inspected an earlier job by plaintiff and found it to be "satisfactory." Hamlin rated plaintiff's masonry work as "about a hundred percent better than the existing school's workmanship." Hamlin added that there had been no problem with plaintiff meeting completion deadlines. Hamlin explained that plaintiff had been obliged to integrate new work with existing masonry in several places, and that in no instance had plaintiff done faulty work, but in some instances

where irregularities were present plaintiff had done the job as directed by Hamlin.

George Ehlert identified himself as president and principal engineer for Ehlert, Bryant Consulting Engineers of Southfield. Ehlert testified that his review of the plans for Novi High School indicated that the masonry work specified by the architect and the owner was "standard masonry," "no higher than average quality standards." Ehlert further opined upon review of plaintiff's work on that job that plaintiff's results fit "well within the tolerances" specified.

Plaintiff charged defendants with defamation and tortious interference with a business relationship or expectancy. The trial court concluded that plaintiff had failed to prove that King's statements concerning plaintiff and prevailing wages were false. However, the court found that King's statements concerning plaintiff's quality of work and ability to do the job on time were false, and negligently so. The court further concluded that King was acting on behalf of the defendant union, and so the latter shared in the responsibility for any damages. The court thus held both defendants liable for defamation and tortious interference with business expectancy. With regard to damages, the court found that plaintiff's business reputation had not been hurt and that damages were limited to the lost profit from the rejected bid, plus interest, costs, and attorney fees.

I

Defendants argue that the trial court erred in finding them liable for tortious interference with a business expectancy as the result of defendants' use of

misleading statements to persuade a governmental entity not to award a contract to plaintiff. They contend that they were engaged in political advocacy that was immune from suit under the *Noerr-Pennington* doctrine.

The two seminal cases that engendered the name of the doctrine at issue are *Eastern Railroad Presidents Conference v Noerr Motor Freight, Inc,* 365 US 127; 81 S Ct 523; 5 L Ed 2d 464 (1961), and *United Mine Workers of America v Pennington,* 381 US 657; 85 S Ct 1585; 14 L Ed 2d 626 (1965).

*Noerr* concerned competition between trucking and railroad concerns and attempts by each interest to engage in publicity campaigns designed to foster adoption and enforcement of laws harmful to the other, as well as to degrade the public image of the other's enterprise, and to impair relationships between the rival and existing customers. *Noerr, supra* at 128-129, 132-133. Each accused the other of violating antitrust law. *Id.* The United States Supreme Court ruled that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Id.* at 135. The Court added, "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Id.* at 137. The Court also touched on the First Amendment issue: "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* at 138. In this regard, deception of the public and of public officials, "reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *Id.* at 145. The Court thus "re-

stored what appears to be the true nature of the case—a 'no-holds-barred fight' between two industries both of which are seeking control of a profitable source of income." *Id.* at 144.

*Pennington* involved a mine workers' union and large mining interests that had conspired to put smaller mining concerns out of business, including by way of lobbying the government to establish an unusually high minimum wage for employees of contractors selling coal to the Tennessee Valley Authority that the smaller competitors could not afford. *Pennington, supra* at 660. The United States Supreme Court explained that "Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Pennington, supra* at 670. The Court disparaged a lower court for concluding that proof of an illegal purpose removed such advocacy from the protections of *Noerr. Pennington, supra* at 670. The Court elaborated: "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.*

Other than *Noerr*'s brief mention of the constitutional right to petition government, *Noerr* and *Pennington* both concern themselves with antitrust legislation. However,

"[a]lthough the *Noerr-Pennington* doctrine initially arose in the antitrust field, other circuits have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws, including . . . common-law tortious interference with contractual relations . . . . There is simply no reason that a common-law tort doc-

trine can any more permissibly abridge or chill the constitu-
tional right of petition than can a statutory claim such as
antitrust." [*Arim v General Motors Corp*, 206 Mich App 178,
191; 520 NW2d 695 (1994), omitting citations and quoting
with approval *Video Int'l Production, Inc v Warner-Amex
Cable Communications, Inc*, 858 F2d 1075, 1084 (CA 5,
1988).]

Stated otherwise, "the *Noerr-Pennington* doctrine is a
principle of constitutional law that bars litigation aris-
ing from injuries received as a consequence of First
Amendment petitioning activity, regardless of the
underlying cause of action asserted by the plaintiffs."
*Azzar v Primebank, FSB*, 198 Mich App 512, 517; 499
NW2d 793 (1993). In *Azzar*, this Court, citing *Noerr-
Pennington*, held that the defendants had a First
Amendment right to lobby the Federal Home Loan
Bank Board not to approve a proposed stock acquisi-
tion. *Azzar, supra* at 514-517. This Court emphasized
that the First Amendment protects a petitioner from
tort liability even for intentionally misrepresenting
facts to the governmental entity. *Id.* at 517.

This Court continued, "Nevertheless, knowingly and
maliciously made allegations in petitions to govern-
ment are not protected under the First Amendment
from liability for defamation." *Id.* at 518. Defamation
was not alleged in *Azzar. Id.* Defendants argue that if
the underlying political advocacy was itself defama-
tory, *Noerr-Pennington* does not apply. However,
because *Azzar* emphatically stands for the proposi-
tion that "knowing falsehoods are generally protected
under the First Amendment right to petition," *Azzar,
supra* at 518-519, we read the case as standing for the
proposition that defamation—injury to a person's
good name—is actionable as the result of petitioning

the government only where the petitioning was actually a "sham."

Concerning the "sham exception" to the *Noerr-Pennington* doctrine, the United States Supreme Court stated, "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." *Noerr, supra* at 144. The Court then makes clear that a "genuine effort to influence legislation and law enforcement," particularly a "highly successful" one, cannot violate the Sherman Act. *Id.* This Court recognized that the "sham exception to the *Noerr* doctrine involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all and is inapplicable to the defendant who genuinely seeks to achieve his governmental result, but does so through improper means." *Azzar, supra* at 518, citing *City of Columbia v Omni Outdoor Advertising, Inc,* 499 US 365; 111 S Ct 1344; 113 L Ed 2d 382 (1991). *Arim* applied the "sham" exception to baseless litigation intended only to force a competitor to bear the burdens of litigation. *Arim, supra* at 190.

In this case, the trial court concluded that defendants had committed defamation, but did not suggest that defendants acted without a serious intention of influencing the Wayne city council. Indeed, defendants succeeded in persuading the council to award their masonry contract to a concern other than plaintiff, thus making it impossible for the sham exception to apply. *Noerr, supra* at 144.

Defendants further argue that, where government action effects some sort of injury, the government is the proximate cause of that injury, not the private parties who may have influenced the government. Defendants additionally note that *Pennington* concerned efforts to persuade the Tennessee Valley Authority to purchase coal only from particular suppliers, and thus argue that *Pennington* itself "dealt with the government acting in a purchasing capacity." However, in *Pennington* this was a matter of setting policy, in the form of a minimum wage, not of selecting specific vendors. *Id.* at 660. *Pennington* thus can be summoned in support of both points of view.

We find defendants' arguments convincing. That lobbying for favorable political action is an inherent part of the nature of government, and of the fabric of our society, should be too obvious to require citation. Also self-evident is that such lobbying characteristically includes placing one's interests in the best light and trying to place a rival's interests in the worst possible light. The right to petition government should immunize any petitioner from liability for the resulting actions of government, not just objective and fairminded petitioners who disclose all motives behind their campaigns.

However, plaintiff cites several federal cases for the proposition that the *Noerr-Pennington* doctrine does not insulate a petitioner from liability for false representations made in the course of influencing a governmental entity to act where the governmental entity is not setting or enforcing policy but is instead simply acting as a market participant. Although the cases cited are not binding on this Court, the cases remain persuasive authority.

Plaintiff relies heavily on *George R Whitten, Jr, Inc v Paddock Pool Builders, Inc*, 424 F2d 25 (CA 1, 1970), an antitrust case. As in the instant case, that case concerned a governmental entity contracting for construction of a swimming pool. The federal court held that where a bidder induced governmental patronage by misconduct, including false statements about a competitor's lack of experience, the *Noerr-Pennington* doctrine did not apply, *id.* at 32-34, on the ground that the governmental entity was acting "in a proprietary capacity, purchasing goods and services to satisfy its own needs within a framework of competitive bidding." *Id.* at 29.

However, the federal circuits are not unanimous on this issue. Fifteen years after *Whitten*, the Fifth Circuit Court of Appeals, in another antitrust case, expressly rejected this aspect of *Whitten*. *Greenwood Utilities Comm v Mississippi Power Co*, 751 F2d 1484, 1505, n 14 (CA 5, 1985). The court decreed, "the protected status of the agreement adopted ought properly to hinge on the protected status of the petitioning conduct that sought the government action." *Id.* at 1505. The court further stated:

> We reject any notion that there should be a commercial exception to *Noerr-Pennington*, because although such a distinction may be intuitively appealing it proves difficult, if not impossible, of application in a case . . . where the government engages in a policy decision and at the same time acts as a participant in the marketplace. [*Id.*]

Defendants fail to point to cases expressly rejecting the reasoning espoused by *Whitten*, but argue that the cases on which plaintiff relies were decided before the United States Supreme Court reaffirmed that the "only" exception to the *Noerr-Pennington* doctrine is

the "sham" exception," citing *Omni Outdoor Advertising, Inc, supra*. However, defendants provide no pinpoint citation for the proposition that the sham exception was heralded as the exclusive exception to *Noerr-Pennington* to the extent of overruling those cases that held that the doctrine does not apply where the government is making procurement decisions, including fielding competitive bids. Instead, *Columbia* considered and rejected a "conspiracy" exception to *Noerr-Pennington*, 499 US 374, while nowhere hinting that the "sham" exception held that status exclusively as a matter of law. The Court has not resolved the question whether the doctrine applies where the government is acting as a market participant.[1]

---

[1] Cases comporting with *Whitten* include the following: *Israel v Baxter Laboratories, Inc*, 151 US App DC 101, 104-107; 466 F2d 272 (1972) (applying *Whitten* to drug manufacturers' joint efforts to lobby the FDA to keep a competitor's product off the market; efforts to "preclude," not "induce," fair consideration of a competitor's product fall within the "sham" exception to *Noerr-Pennington*); *Woods Exploration & Producing Co v Aluminum Co of America*, 438 F2d 1286, 1294 (CA 5, 1971); *Hecht v Pro-Football, Inc*, 144 US App DC 56, 59; 444 F2d 931 (1971); *F Buddie Contracting, Inc v Seawright*, 595 F Supp 422, 439 (ND Ohio, 1984) (recognizing that the Sixth Circuit has not decided the issue and adopting the view that *Noerr-Pennington* does not apply "where the parties are concerned with the award of a competitively bid contract which only incidentally involves a governmental body"); *Hill Aircraft & Leasing Corp v Fulton Co*, 561 F Supp 667, 675 (ND Ga, 1982) (*Noerr-Pennington* "is not a defense for parties who seek to influence officials acting in a purely commercial, or proprietary, rather than 'governmental' capacity"), aff'd 729 F2d 1467 (CA 11, 1984) (unpublished).

Cases distancing themselves from *Whitten* include the following: *In re Airport Car Rental Antitrust Litigation*, 693 F2d 84, 88 (CA 9, 1982) (distinguishing *Whitten*, "There is no commercial exception to *Noerr-Pennington*"); *Reamco, Inc v Allegheny Airlines*, 496 F Supp 546, 556, n 6 (SD NY 1980) (the "argument, based on *Whitten*, that the *Noerr-Pennington* doctrine insulates only those acts aimed at influencing governmental action on broad policy questions involving the passage or enforcement of legislation, and not actions related to narrow issues between specific parties, must be rejected in light of [the contrary conclu-

Plaintiff contends that the proper focus is on the role of the governmental entity petitioned, suggesting that if a governmental entity is accepting bids on a contract, it is stepping outside its governmental role and acting purely as a market participant, and so *Noerr-Pennington* should not apply. However, plaintiff cites no case that specifically identifies the "commercial exception" with the petitioner's role as seeker of patronage as opposed to the government's role as market participant seeking to fulfill its own needs. Further, if it is proper to distinguish between government performing a purely governmental function and government seeking to fulfill its own needs, this case does not provide an opportunity to recognize it. The city of Wayne in this instance was fielding bids for a swimming pool. There is no suggestion that the Wayne Aquatic Center was envisioned as a governmental benefit for its own operatives; presumably the pool was for public use, indicating that the city was *not* fulfilling its own needs, but was instead providing a facility for the benefit of the general public.[2]

Our research has unveiled no Sixth Circuit decisions resolving this federal question. Nor have the appellate courts of this state fully resolved the issue as presented in this case. Thus, the question whether *Noerr-Pennington* applies in this state to situations such as that presented in the instant case comes to this Court as one of first impression.

---

sion of *California Motor Transport v Trucking Unlimited*, 404 US 508; 92 S Ct 609; 30 L Ed 2d 642 (1972)]."); *Bustop Shelters, Inc v Convenience & Safety Corp*, 521 F Supp 989, 996 (SD NY, 1981) ("*Whitten* . . . [has] been disapproved in this circuit, as implicitly overruled or weakened by *California Motor Transport*.").

. [2] *Whitten* notwithstanding. 424 F2d 29 (characterizing the acceptance of bids for a swimming pool as government fulfilling its own needs).

It is not obvious why different rights, duties, or immunities should apply when one is lobbying for political action in the form of outright commercial patronage, as opposed to legislation or enforcement actions. As *Hill Aircraft & Leasing Corp v Fulton Co*, 561 F Supp 667 (ND Ga, 1982), a case friendly to the commercial exception to *Noerr-Pennington*, conceded, "The line between policymaking and commercial activity is not easy to draw . . . ." *Id.* at 675. Government, unlike a private business, is politically accountable to, and ostensibly responsible to act on behalf of, the general public. All persons concerned should expect petitioners for governmental action to proceed with the most selfish of motives and tactics; government, not its supplicants, should bear the responsibility for the decisions government makes, and for the influences it accepts.

Further, the problems with identifying cause and effect identified by *Sessions Tank Liners, Inc v Joor Mfg, Inc*, 17 F3d 295, 300 (CA 9, 1994), come to bear in the instant case. The minutes of the Wayne city council reflect that the council rejected plaintiff's bid because of concerns about plaintiff's workmanship and failure to pay the prevailing wage. However, there is no way to ascertain the extent to which each consideration affected the council's decision. The trial court found King's representations concerning plaintiff's craftsmanship to be false, but did not so regard King's representations concerning plaintiff and the prevailing wage. Thus, the council acted in response to one argument that was found to support a claim of defamation, and for one that was found not to, and the extent to which the latter, legally unactionable, representation tipped the balance is undiscoverable.

Further, the lack of mention in the minutes of any preference for union workers should not foreclose the possibility that prounion sentiments, obviously a legitimate political consideration, affected the decision. Accordingly, we conclude that plaintiff is not entitled to damages resulting from the loss of the government contract, and we reverse the trial court's judgment in this regard.

II

Next, defendants contend that the underlying controversy in this case was a labor dispute and, therefore, the National Labor Relations Board has exclusive jurisdiction over the matter. We disagree.

Section 157 of the National Labor Relations Act (NLRA), 29 USC 141 *et seq.*, sets forth the rights of employees to organize into unions. Section 158 in turn lists unfair labor practices. Section 160(a) empowers the National Labor Relations Board (NLRB) "to prevent any person from engaging in any unfair labor practice . . . affecting commerce." The United States Supreme Court has interpreted the NLRA to confer broad exclusive jurisdiction on the NLRB to resolve labor disputes: "When an activity is arguably subject to § 7 [29 USC 157] or § 8 [29 USC 158] of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national labor policy is to be averted." *San Diego Building Trades Council v Garmon*, 359 US 236, 245; 79 S Ct 773; 3 L Ed 2d 775 (1959).

Where an action for tortious interference with business lies at the heart of a labor dispute, the claim is

preempted by the NLRA. *Falls Stamping & Welding Co v Int'l Union, UAW*, 744 F2d 521, 524-525 (CA 6, 1984). However, matters of "merely peripheral concern" to federal labor law, involving interests "deeply rooted in local feeling and responsibility," are not preempted by the NLRA. *Garmon, supra* at 243-244.

Defendants cite §§ 157 or 158 of the NLRA generally, but point specifically only to subsection 158(b)(4) in support of their argument. That provision itself is quite general, identifying several actions as unlawful for a union to take. Subsection (b)(4)(i) concerns secondary strikes, which are not at issue here. Subsection (b)(4)(ii)(A) covers "forcing" an employer to join a union or enter into prohibited agreements; subsection (b)(4)(ii)(B) covers "forcing or requiring any person" to engage in secondary boycotts, or to recognize a union whose employees are not certified as belonging to that union; subsection (b)(4)(ii)(C) covers "forcing or requiring" an employer to recognize a union where the employer's work force already has a union; subsection (b)(4)(ii)(D) covers "forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class . . . ." Each provision of subsection 158(b)(4) thus concerns some improper use of force; because defendants in this case can hardly be construed to have "forced" the city council not to accept plaintiff's bid, none of those provisions comes to bear on this case.

Defendants cite several cases that illustrate the breadth of activities that have been determined to come under the exclusive jurisdiction of the NLRB.

However, each concerns overt union advocacy (e.g., supporting a strike in progress, members' pamphleteering at a mall to object to a nonunion contractor), whereas the instant case concerned only what was a lone union official, presenting himself as nothing more than a concerned citizen, reminding a city council that the low bidder on a job was nonunion, raising the issue of prevailing wage, and stating that the city was a "union town." There was no organized campaign to induce plaintiff's work force to join a union. King's general prounion statements, and concerns about the prevailing wage, do not, in the context of urging a city council to reject the lowest bidder, fall within the NLRA. Such broad deference to exclusive NLRB jurisdiction would remove from state and federal courts virtually any action connected in some way with employment where someone expresses sentiments concerning unionization somewhere in the course of the underlying controversy.

For these reasons, the trial court correctly concluded that the instant cause of action was not preempted by federal law, and thus properly entertained the cause in state court.

III

Defendants also contend that the trial court erred in using an ordinary negligence standard in finding defendants liable for damaging misstatements made in the course of petitioning the government.

Defendants concede that "knowing and malicious falsehoods made in the course of petitioning activity can be challenged in a defamation action, . . . but care must be taken that defamation not be used to vitiate

the absolute First Amendment protection afforded by *Noerr-Pennington.*" Because the threat of defamation actions could "dampen the ardor of labor debate," and because "the availability of libel actions may pose a threat to the stability of labor unions and smaller employers," the United States Supreme Court has ruled, "We . . . limit the availability of state remedies for libel to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Linn v United Plant Guard Workers of America,* 383 US 53, 64-65; 86 S Ct 657; 15 L Ed 2d 582 (1966). The Court further adopted for such cases the standard for malice set forth in *New York Times Co v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964). Thus,

> [c]onstruing the [NLRA] to permit recovery of damages in a state cause of action only for defamatory statements published with knowledge of their falsity or with reckless disregard of whether they were true or false guards against abuse of libel action, and unwarranted intrusion upon free discussion envisioned by the Act. [*Linn, supra* at 65.]

Because we have concluded that King's protestations before the Wayne city council cannot properly be characterized as statements made in the course of a labor dispute, any qualified privilege a labor dispute may engender does not apply in this instance. This leaves the question of qualified immunity for petitioners under the First Amendment in cases of defamation.

"States . . . retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Gertz v Robert Welch, Inc,* 418 US 323, 345-346; 94 S Ct 2997; 41 L Ed 2d 789 (1974). Accordingly, where a

state allows private figures to recover for defamation absent proof of actual knowledge of a false statement or reckless disregard for its truth (in other words, on an ordinary negligence standard), recovery is limited to damages for actual injury. *Id.* at 349-350. The Court held open the possibility that where a state demands the higher standard of proof, damages may be presumed, and may include a punitive award. *Id.* at 349.

Ordinary negligence is sufficient in proving a case of defamation of a private figure in Michigan. *Rouch v Enquirer & News of Battle Creek*, 427 Mich 157, 202-203; 398 NW2d 245 (1986). The question is whether that standard changes if the alleged defamation takes the form of petitioning a governmental entity.

Plaintiff relies on *Hodgins Kennels, Inc v Durbin*, 170 Mich App 474; 429 NW2d 189 (1988), rev'd in part 432 Mich 894 (1989), where this Court ruled that because the plaintiffs were not public figures, the defendants "therefore had no qualified privilege regarding alleged defamatory statements made about them, even if all the statements at issue had been directed to petition clause activity . . . ." Defendants assert that *Hodgins* was incorrectly decided and suggest that this Court more recently recognized the actual malice standard, having stated that "knowingly and maliciously made allegations in petitions to government are not protected under the First Amendment from liability for defamation," *Azzar, supra* at 518, citing *McDonald v Smith*, 472 US 479; 105 S Ct 1787; 86 L Ed 2d 384 (1985), and *Hodgins, supra* at 483. However, *Azzar* was not a defamation case, and it did cite *Hodgins* with approval.

*McDonald, supra*, concerned a defendant who had written to the President of the United States letters

with "libelous and damaging falsehoods" disparaging a public figure who was contending for the position of United States Attorney. 472 US 481-482. The Court reiterated that the right to petition was not absolute, *id.* at 484 ("baseless litigation is not immunized by the First Amendment"), and concluded that such petitioning was not absolutely privileged but lay within the reach of the law of libel. *Id.* at 484-485. The Court continued:

> Under state common law, damages may be recovered only if petitioner is shown to have acted with malice; 'malice' has been defined . . . in terms . . . considered consistent with *New York Times Co v Sullivan* . . . as 'knowledge at the time that the words are false, or . . . without probable cause or without checking for truth by the means at hand.'"
> [*McDonald, supra* at 485, quoting *Dellinger v Belk,* 34 NC App 488, 490; 238 SE2d 788 (1977).]

The Court concluded, "the Petition Clause does not require the State to expand this privilege into an absolute one. The right to petition is guaranteed; the right to commit libel with impunity is not." *Id.* Because the Court referred to "state common law," as opposed to the body of federal law that gave rise to the distinction between public and private figures, the Court's reference to *New York Times Co v Sullivan* appears to invoke not its public figure/private figure dichotomy, but instead its standard of known falsehood or reckless disregard of the truth.

This reckless disregard standard is a higher one than ordinary negligence. Some "definitions of wilful, wanton, and reckless misconduct are also, in part, 'couched in terms of ordinary negligence . . . .' " *Burnett v City of Adrian,* 414 Mich 448, 472; 326 NW2d 810 (1982). However, "reckless disregard" for conse-

quences is normally regarded as a more culpable state of mind than ordinary negligence. See *Nationwide Mut Fire Ins Co v Detroit Edison Co*, 95 Mich App 62, 66; 289 NW2d 879 (1980), quoting Prosser, Torts (4th ed), § 34, pp 183-184 ("most courts consider that 'gross negligence' falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree' "). See also *Gertz, supra* at 349 (likening "knowledge of falsity" to "reckless disregard for the truth").

For these reasons, we conclude that where a defendant makes damaging statements injurious to a private figure in the context of political petitioning, those statements cannot engender liability for defamation if the defendant acted only negligently, but may do so upon a finding that the defendant made the statements knowing that they were false or with a reckless disregard for the truth. Thus, in this instant case, the trial court erred in confining its inquiry to ordinary negligence. Because any award of damages hinges on the presence of actual malice, we remand this case to the trial court for reevaluation of the evidence under that standard.

Reversed in part and remanded. Jurisdiction is not retained.