**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 9, 2003**

J & J CONSTRUCTION CO.,

    Plaintiff-Appellant,

v                                           No. 119357

BRICKLAYERS AND ALLIED CRAFTSMEN,
LOCAL 1 and MARK KING, jointly and
severally,

    Defendants-Appellees.
_____

**BEFORE THE ENTIRE BENCH**

**YOUNG, J.**

Plaintiff appeals the judgment of the Court of Appeals regarding several issues involving the Petition Clause of the First Amendment. We reverse that judgment and reinstate the judgment of the trial court.

## I. Facts and Procedural History

Plaintiff, a construction company, submitted a bid to perform a masonry contract for the city of Wayne. Plaintiff was the low bidder for the contract. Pursuant to the Wayne

City Charter, the city council was obligated to award the contract to the lowest qualified bidder unless it determined that the public interest would be better served by accepting a higher bid. Wayne City Charter, § 13.1(d).[1]

Defendant Mark King,[2] a Bricklayers & Allied Craftsmen Union field representative with fifteen years experience as a mason, discovered that plaintiff, a nonunion employer, was the low bidder for the masonry contract. He thereafter set out to dissuade the city council from awarding the contract to plaintiff. In this effort, defendant presented privately to the city manager, and to the city council in public session, deceptive photographs of plaintiff's masonry work that suggested plaintiff's workmanship was of poor quality. He also represented that plaintiff might not be able to perform the contract in a timely manner. After plaintiff attempted to

---

[1]Section 13.1(d) specifically provides:

Purchases shall be made from the lowest qualified bidder meeting specifications, unless the Council shall determine that the public interest will be better served by accepting a higher bid, sales shall be made to the bidder whose bid is most advantageous to the City. In any case where a bid, other than the lowest, is accepted, the Council shall set forth its reasons therefor in its resolution accepting such bid.

[2]Because the trial court found that King was acting in his capacity as a union representative and thus on behalf of the defendant union during the events at issue, we will refer to both defendants in the singular.

respond to these allegations during the public meeting of the council, defendant made reference to the fact that plaintiff was a nonunion contractor that did not pay the prevailing wage to its employees.

Because of its concerns regarding the allegations defendant made against plaintiff, the city council referred plaintiff's bid to the city administration for further review. Following that review, the city council awarded the masonry contract to the second lowest bidder, stating in its resolution that "the Council had concerns as to the low bidder because of claims made about faulty workmanship and because of concerns about noncompliance with the payment of prevailing wages and fringe benefits . . . ."

Having lost the contract bid, plaintiff filed a complaint against defendant for defamation and tortious interference with business expectations. Applying an ordinary negligence standard, the trial court found that defendant's statements regarding the quality of plaintiff's workmanship and plaintiff's prospective ability to complete the job on time were false and defamatory, but that plaintiff failed to meet its burden of proving that defendant's prevailing wage statements were false. Regarding the defamation claim, the trial court rejected defendant's argument that a qualified privilege existed because the statements were made while

3

petitioning the government, reasoning that the qualified privilege "actual malice" standard was inapplicable because plaintiff was a private, not a public, figure. Having found defendant's statements regarding plaintiff's workmanship and prospective ability to timely complete the project to be false, defamatory, and unprivileged, the trial court held defendant liable for defamation under MCL 600.2911(7).[3]

In addition, the trial court concluded that the defamation formed the foundation for tortious interference with business expectations. The court declined to protect defendant from liability from this claim on the basis of the principles of the *Noerr-Pennington* doctrine,[4] which protect petitioning activity from antitrust violations when the petition concerns legislative or regulatory issues. The court concluded that defendant's statements were not made in an

---

[3]MCL 600.2911(7) provides:

> An action for libel or slander shall not be brought based upon a communication involving a private individual unless the defamatory falsehood concerns the private individual and was published negligently. Recovery under this provision shall be limited to economic damages including attorney fees.

[4]The *Noerr-Pennington* doctrine is derived from two United States Supreme Court cases pertaining to the Petition Clause and antitrust laws: *Eastern Railroad Presidents Conference v Noerr Motor Freight, Inc,* 365 US 127; 81 S Ct 523; 5 L Ed 2d 464 (1961), and *United Mine Workers of America v Pennington*, 381 US 657; 85 S Ct 1585; 14 L Ed 2d 626 (1965).

attempt to urge legislative or regulatory policy decisions. In essence, the trial court applied what the Court of Appeals and the parties have termed a "market participant" exception to the *Noerr-Pennington* doctrine.[5]

The trial court awarded plaintiff damages of $57,888, the loss of expected profits under the contract for both the claim of defamation and the claim of tortious interference with business expectations. Attorney fees of $104,286.95 and interest of $26,044.51 were also awarded to plaintiff.

Defendant appealed, and the Court of Appeals affirmed in part,[6] reversed in part, and remanded for further proceedings. The Court of Appeals concluded that where petitioning activity is involved, the "actual malice" standard for defamation

---

[5]The "market participant" exception to the *Noerr-Pennington* doctrine, adopted in some jurisdictions, but rejected in others, generally provides that a petitioner is not insulated from liability for defamation while petitioning the government where the governmental entity is acting as a market participant, as opposed to making policy. 245 Mich App 722, 733-734; 631 NW2d 42 (2001), citing *George R Whitten, Jr, Inc v Paddock Pool Builders, Inc,* 424 F2d 25 (CA 1, 1970) (adopting an exception to *Noerr-Pennington* where the government is performing a proprietary function); *Greenwood Utilities Comm v Mississippi Power Co*, 751 F2d 1484, 1505 n 14 (CA 5, 1985) (expressly rejecting *Whitten*).

[6]The trial court also rejected defendant's argument that plaintiff's claims are preempted by the National Labor Relations Act, 29 USC 151 *et seq.* The Court of Appeals affirmed the trial court's decision regarding this federal preemption issue. Defendant has not cross-appealed on this issue or moved to have it added as an issue of dispute before this Court. Accordingly, we will not address that portion of the judgment of the Court of Appeals.

5

claims established in *New York Times Co v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), applies regardless whether plaintiff is a private or public figure. Because the trial court only issued a finding that defendant's defamatory statements were negligent, the Court of Appeals remanded the case to the trial court for a determination whether defendant's conduct constituted "actual malice."

Regarding the claim of tortious interference with business expectations, the Court of Appeals held that "'the *Noerr-Pennington* doctrine is a principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs.'" 245 Mich App 730, quoting *Azzar v Primebank, FSB,* 198 Mich App 512, 517; 499 NW2d 793 (1993). Relying on *Azzar,* the Court of Appeals concluded that defamation is actionable on the basis of petition activity only where the petitioning was actually a "sham." Further, the panel reversed the trial court's application of the "market participant" exception to the *Noerr-Pennington* doctrine, writing that "[i]t is not obvious why different rights, duties, or immunities should apply when one is lobbying for political action in the form of outright commercial patronage, as opposed to legislation or enforcement actions." 245 Mich

App 736.

We granted leave to appeal. 466 Mich 859 (2002).

## II.  Standard of Review

Plaintiff's appeal raises three issues of federal constitutional law[7] regarding the Petition Clause: first, whether a private-figure plaintiff must prove "actual malice" in a defamation claim against a defendant whose contested statements were made while petitioning the government; second, considering the *Noerr-Pennington* doctrine, whether a cause of action exists for tortious interference with business expectations as the result of statements made by a defendant while petitioning the government; and third, whether there exists a "market participant" exception to the *Noerr-Pennington* doctrine.

The protections provided by the First Amendment, including the Petition Clause, have been extended to the states by the Fourteenth Amendment. *Whitehill v Elkins,* 389 US 54, 57; 88 S Ct 184; 19 L Ed 2d 228 (1967).  We review de novo issues of constitutional law.  *McDougall v Schanz,* 461

---

[7]Const 1963, art I, § 3 provides that "[t]he people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances."  However, the parties have neither rested their arguments on this state constitutional right nor suggested that this provision is interpreted any differently from the Petition Clause of the First Amendment.  Accordingly, our consideration is limited to the federal constitutional issues presented.

Mich 15, 24; 597 NW2d 148 (1999).

## III. Discussion

### A. Defamation

The first issue presented is whether the private-figure and public-figure dichotomy embodied in defamation case law on freedom of speech and freedom of the press from the United States Supreme Court extends to defamation involving the right to petition. The United States Supreme Court has never been squarely presented with, or decided, this question.[8]

However, we are guided by the general Petition Clause defamation concepts announced in *McDonald v Smith*, 472 US 479; 105 S Ct 2787; 86 L Ed 2d 384 (1985). In rejecting an

---

[8]While in this opinion we conclude that *McDonald v Smith*, 472 US 479; 105 S Ct 2787; 86 L Ed 2d 384 (1985), provides sufficient guidance to resolve the pending issues, we believe the Supreme Court has never directly addressed whether the private-figure and public-figure doctrine of free speech and free press defamation law announced in *Gertz v Robert Welch, Inc*, 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), discussed below, applies in a petition case.

The Court had no cause to discuss the *Gertz* doctrine in *McDonald,* inasmuch as the *McDonald* plaintiff was a public figure and, thus, defendant was constitutionally entitled to the qualified immunity "actual malice" standard of *New York Times,* as a result of the *McDonald* Court holding that the Petition Clause provided no greater defamation protection than the Free Speech Clause and the Free Press Clause. In addition, under the state common law of North Carolina, which was at issue in *McDonald*, "actual malice" was the governing standard for both private-figure and public-figure defamation actions. As a result, the fact pattern in *McDonald* did not invite or require a discussion of the private-figure and public-figure dichotomy.

8

argument that absolute immunity attaches to the right to petition, the *McDonald* Court wrote:

> To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. *These First Amendment rights are inseparable and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.* [*McDonald, supra* at 485 (internal citations omitted; emphasis added).]

By this reasoning, at least regarding the constitutional law of defamation immunity, the Court has made clear that it considers the Petition Clause as offering no greater protection than that of the Free Speech Clause and the Free Press Clause. In so concluding, we believe the Court has strongly signaled its view that all the Free Speech Clause and Free Press Clause defamation doctrine developed in the past forty years is to be imported without change to constitutional adjudications arising under the Petition Clause.[9] Accordingly, an analysis of relevant United States Supreme Court case law on free speech and free press defamation is essential. *Production Steel Strip Corp v Detroit,* 390 Mich

---

[9]In interpreting the *federal* constitution, state courts are not privileged to provide greater protections or restrictions when the Supreme Court of the United States has refrained from doing so. *Arkansas v Sullivan,* 532 US 769, 772; 121 S Ct 1876; 149 L Ed 2d 994 (2001).

508, 514; 213 NW2d 419 (1973).

Under long-settled constitutional principles concerning the First Amendment rights of freedom of speech and freedom of the press, a *public*-figure plaintiff must establish that a defendant made defamatory statements with "actual malice" in order to prevail in a defamation action. *New York Times, supra* (establishing the "actual malice" standard for liability for defamation of public officials); *Curtis Publishing Co v Butts,* 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094 (1967) (extending the "actual malice" standard to public figures). "Actual malice" exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth. *New York Times, supra* at 280. In other words, a defamation defendant is entitled to a qualified privilege in the form of a heightened "actual malice" standard required to be met by a public-figure plaintiff.

In contrast, a defamation defendant whose alleged defamatory statements pertained to a *private* figure receives no such constitutional protection under case law on freedom of speech and freedom of the press. Rather, the states are left to decide for themselves whether a private-figure plaintiff must establish more than ordinary negligence as a predicate for recovery for defamation. *Gertz v Robert Welch, Inc*, 418

US 323, 346-348; 94 S Ct 2997; 41 L Ed 2d 789 (1974).[10] In *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157; 398 NW2d 245 (1986), this Court held that a defamation defendant is not entitled to a qualified privilege in a case involving a private-figure plaintiff under Michigan law, and thus declined to extend greater protection than constitutionally required under *Gertz.*[11] More important, the Michigan Legislature codified the *Rouch* holding in 1988, statutorily providing that defamation of a private figure requires only a showing of negligence, not actual malice. MCL 600.2911(7).[12]

Because the United States Supreme Court has concluded that the right to petition should be accorded no greater protection than the rights to free speech and free press,

---

[10]*Gertz* specifically held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347. Accordingly, defamation against a private figure still requires that fault be established. In addition, private-figure plaintiffs may only recover actual damages under a negligence standard for defamation. In order to recover any presumed or punitive damages, *Gertz* requires proof of actual malice. *Id.* at 350.

[11]Where the alleged defamation concerns both a private figure and a matter of private concern, the burden of proving that the statement was not false rests with the defendant. However, where the statements are of public concern, the private-figure plaintiff bears the burden of proving falsity. *Rouch*, *supra* at 181, citing *Philadelphia Newspapers, Inc v Hepps,* 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986). In this case, plaintiff proved falsity at trial.

[12]See n 3.

11

*McDonald, supra* at 485, we conclude that the private-figure and public-figure dichotomy that applies to defamation claims involving the Free Speech Clause and the Free Press Clause, *Gertz, supra* at 342-347, also applies to defamation claims involving the Petition Clause. Accordingly, we reverse the judgment of the Court of Appeals that the "actual malice" qualified immunity standard of *New York Times* applies in Petition Clause defamation cases regardless whether the plaintiff is a private or public figure. Extending *Gertz* in the manner suggested by *McDonald*, a defamation defendant whose statements about a private figure are made while petitioning the government is not constitutionally entitled to a qualified immunity in the form of the heightened "actual malice" standard. Because MCL 600.2911(7) provides no greater protection for such defendants, the Court of Appeals erred. The trial court's decision concerning plaintiff's defamation claim is reinstated.

B. Tortious Interference With Business Expectations

Although we maintain reservations about the judgment of the Court of Appeals regarding the claim of tortious interference with business expectations, concerning the *Noerr-Pennington* doctrine and any "market participant" exception to that doctrine, we need not review those issues here.

The trial court awarded damages for lost business profits

12

under alternative theories of defamation and tortious interference with business expectations based on defamation. Attorneys fees were awarded pursuant to MCL 600.2911(7), which pertains to defamation actions. In light of our reversal of the judgment of the Court of Appeals regarding defamation and the resulting reinstatement of the trial court's decision on that claim, the full judgment amount awarded by the trial court to plaintiff is restored.

Accordingly, our disposition of the remaining federal constitutional issues raised by the parties and decided by the Court of Appeals will not alter the ultimate resolution of this case. This Court will not unnecessarily decide constitutional issues, *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001), and it is an undisputed principle of judicial review that questions of constitutionality should not be decided if the case may be disposed of on other grounds. *MacLean v Michigan State Bd of Control for Vocational Ed,* 294 Mich 45, 50; 292 NW 662 (1940).

For these reasons, we decline to address the federal constitutional issues presented concerning the *Noerr-Pennington* doctrine and the suggested "market participant" exception to that doctrine. Although we question the analysis of the Court of Appeals regarding those issues, our resolution of the case makes it unnecessary for us to address them.

## Conclusion

The Court of Appeals incorrectly concluded that the private-figure and public-figure dichotomy present in freedom of speech and freedom of the press case law is inapplicable to defamation claims involving the right to petition. In *McDonald, supra* at 485, the United States Supreme Court stated that "there is no sound basis for granting greater constitutional protection to statements made in a petition . . . than other First Amendment expressions." Accordingly, it is clear that the constitutional rules regarding defamation claims involving the Free Speech Clause and the Free Press Clause are applicable to defamation claims involving the Petition Clause.

The private-figure and public-figure dichotomy being one of the constitutional rules, we hold that private-figure defamation plaintiffs are only constitutionally required to prove ordinary negligence in order to establish defamation in cases involving the right to petition. No qualified immunity is constitutionally provided to defamation defendants whose statements about private figures are made while petitioning the government. Because MCL 600.2911(7) does not provide greater protection for defamation defendants than constitutionally required, ordinary negligence is the standard required to be met by private-figure defamation plaintiffs in

14

cases involving the Petition Clause.

For these reasons, we reverse and vacate the judgment of the Court of Appeals and reinstate the judgment of the trial court.

Robert P. Young, Jr.
Maura D. Corrigan
Elizabeth A. Weaver
Clifford W. Taylor
Stephen J. Markman

J & J CONSTRUCTION CO.,

    Plaintiff-Appellant,

v

BRICKLAYERS AND ALLIED CRAFTSMEN,
LOCAL 1 and MARK KING, jointly and
severally,

    Defendants-Appellees.

No. 119357

_____

YOUNG, J. (*concurring*).

Given that we are constrained to follow our best understanding of the United States Supreme Court's direction concerning the Petition Clause, I write separately to suggest that a proper application of the rules of constitutional interpretation produces a result contrary to that reached in *McDonald v Smith*, 472 US 479; 105 S Ct 2787; 86 L Ed 2d 384 (1985). I believe that, under an originalist interpretation of the Petition Clause, the defendant union and union representative would enjoy an absolute immunity from plaintiff's suit for their petitioning activity. Should the Supreme Court of the United States seek to revisit its Petition Clause jurisprudence, there is significant,

persuasive historical evidence suggesting that the contemporary understanding of the Petition Clause as announced in *McDonald* is incompatible with the original understanding of the Petition Clause.

If our majority has correctly determined that *McDonald* stands for the proposition that, at least concerning defamation immunity, the sibling clauses of the First Amendment have no distinctive meaning under our Constitution, I believe *McDonald* was incorrectly decided. Further, an attempt to import constitutional law on defamation involving free speech and free press to situations involving the right to petition raises questions about the soundness of such a principle, as exemplified by our application of the private-figure and public-figure dichotomy to the present case.

Accordingly, by laying out the historical record supporting a conclusion based on an originalist understanding of the Petition Clause, it is my hope that the United States Supreme Court may choose an alternative course to the one suggested by *McDonald*.

## I.  The Petition Clause

### A.  The Rules of Constitutional Interpretation

In interpreting a constitution, the primary objective is to discern the original intent of the constitutional text. See, e.g., *Utah v Evans,* 536 US 452, 491; 122 S Ct 2191; 153

L Ed 2d 453 (2002) (Thomas, J., concurring in part and dissenting in part, joined by Kennedy, J.); *McIntyre v Ohio Elections Comm,* 514 US 334, 359; 115 S Ct 1511; 131 L Ed 2d 426 (1995) (Thomas, J., concurring in judgment, quoting *South Carolina v United States,* 199 US 437, 448; 26 S Ct 110; 50 L Ed 261 [1905]); *Michigan United Conservation Clubs v Secretary of State,* 464 Mich 359, 373; 630 NW2d 297 (2001) (YOUNG, J., concurring); *People v DeJonge,* 442 Mich 266, 274-275; 501 NW2d 127 (1993). See also, 1 Story, Commentaries on the Constitution of the United States (4th ed, 1873), § 426, p 315 (Justice Story stated that the Constitution must "have a fixed, uniform, permanent, construction . . . not dependent upon the passions or parties of particular times, but the same yesterday, to-day, and forever"); Bork, *The Tempting of America* (New York: The Free Press, 1990), ch 7, pp 143-160; Scalia, *A Matter of Interpretation* (Princeton, NJ: Princeton University Press, 1997), pp 37-47. Further, the rights created under the Bill of Rights must be preserved as they existed in 1791. *McIntyre, supra* at 371-372 (Scalia, J., dissenting, joined by Rehnquist, C.J.) (stating that the traditional view held by the Court and society is that the Constitution's original meaning is unchanging); *Curtis v Loether*, 415 US 189, 193; 94 S Ct 1005; 39 L Ed 2d 260 (1974) (a common-law action that becomes statutory is nonetheless

protected by the Seventh Amendment's right to trial by jury); Story, *supra*. This principle of interpretation follows inexorably from the fact that the People provided an explicit method and means for amending the Constitution. US Const, art V.

The questions presented in this case concern the meaning of the Petition Clause of the First Amendment. Accordingly, a thorough analysis of both the history of the practice of petitioning the government before its codification in 1791 as a part of the First Amendment and the common understanding of the text of the Petition Clause at that time is in order.

B.   The Original Understanding of the Petition Clause

1.   The Pre-1791 History of the Petition Right

The right to petition has historical roots in Anglo-American constitutional history dating back to 1013. Smith, *"Shall make no law abridging . . .": An analysis of the neglected, but nearly absolute, right of petition*, 54 U Cin L R 1153, 1154-1155 (1986) (discussing English nobles' petition to Aethelred the Unready in 1013). Even before democracy was practiced in Great Britain, petitioning was recognized as a right granted by the royal sovereign to his subjects, as evidenced in the Magna Carta of 1215. *Id.* at 1155. Developing through the centuries, "petitioning reached enormous popularity" during the era of the Civil War and

Interregnum in England. *Id.* at 1157. In fact, James I expressly provided "the Right of his subjects to make their immediate Addresses to him by Petition." *Id.,* quoting 5 Parl Hist Eng App ccxiv (1701) (Proclamation 10 July, 19 Jac). Charles I followed suit and it is documented as late as 1644 that he invited petitioning and promised that such petitioning would be heard. *Id.*

In the case of *Lake v King,* 1 Wms Saund 131, 85 Eng Rep 137 (1668), whether a defamation action could lie where the alleged defamatory statements were made while petitioning Parliament was at issue.[1] In *Lake*, as in the present case, the libel at issue was civil in nature. Defendant King's petition to Parliament allegedly defamed plaintiff Lake, yet it was held that because the defendant was petitioning Parliament, his statements were immune from liability. Thus, *Lake* established that absolute immunity from defamation

---

[1]Although I realize that the Supreme Court in *White v Nichols,* 44 US (3 How) 266, 289; 11 L Ed 591 (1845), labeled *Lake* "anomalous" and inconsistent with "modern adjudications," I note that constitutional interpretation inquiries are directed at the *original understanding* of a provision. Accordingly, that *Lake* proved to be inconsistent with post-1791 adjudications should be of no consequence where there is no record of *Lake*'s vitality being questioned before 1791. Nor does the absence of any pre-1791 challenge to *Lake* warrant that its rule of law be considered "anomalous." This is particularly evident where subsequent events can be relied on as an indication that *Lake* was considered sound. See the discussion below regarding *The Case of the Seven Bishops*, 12 Howell's State Trials 183 (1688), and the establishment of the English Bill of Rights.

5

actions attaches to a petition, regardless whether the petition contains libelous statements. *Id.*

If there were any question that petitioners in England were protected from defamation liability following *Lake*, *The Case of the Seven Bishops*, 12 Howell's State Trials 183 (1688), and the monumental pivot in English constitutional history that immediately followed *Seven Bishops* appear to have resolved the matter. In April 1688, James II decreed that all churches read a declaration, "Liberty of Conscience," at divine services, which directive many bishops and clergy refused to follow. After seven bishops petitioned to be relieved from the King's mandate, they were prosecuted for seditious libel. Smith, *supra* at 1160-1161.

A central inquiry in *Seven Bishops* was whether the defendants were "petitioning" the King. *Seven Bishops, supra* at 320-321. Defense counsel advanced that the King's indicting document—the information—was insufficient inasmuch as it presented the bishops' allegedly libelous statements in an excerpted fashion, separated from the petition as a whole. The King's prosecutors argued that the defamatory statements were delivered in the pretense of a petition and thus only the libelous paragraphs were germane. The resolution of this question was dispositive because unpopular political speech and press were prosecuted as seditious libel during this

6

period in English history.  Smith, *supra* at 1180.
Accordingly, if the bishops' statement was not properly
communicated pursuant to the recognized petition right,
namely, in a *petition*, the bishops were not immune and could
have been rightly prosecuted for seditious libel.  Following
a lengthy discourse, the entire petition was permitted to be
introduced into evidence and provided to the jury for its
deliberations.  The jury returned a verdict of not guilty.
*Id.* at 1161.

Notwithstanding the verdict in *Seven Bishops*, James II
appealed to the army to enforce his Liberty of Conscience
decree.  In response to the King's appeal, much of the army
declined, laying down their arms.  Thereafter,

> [a] convention of the peers and representatives of
> the realm resolved on January 28-29, 1689, that
> James II had broken the "original contract between
> King and people."  The crown was offered to William
> and Mary upon the condition that they accept the
> Declaration of Rights; acceptance was given on
> February 13, 1689.  The Declaration of Rights
> provided "that *it is the right of the subjects to
> petition the king, and all commitments and
> prosecutions for such petitioning is illegal.*"
> [Smith, *supra* at 1162 (emphasis added).]

The adoption of this petition right in the English Bill
of Rights evinces a clear understanding that the rule of *Lake*,
that petitions to Parliament may not be the subject of
defamation actions, was also the rule concerning petitions to
the king.  As the English codified petition right provided in

1689, it is the "right of the subjects to petition the king, and all commitments and prosecutions for such petitioning are illegal." Schnapper, *"Libelous" petitions for redress of grievances–Bad historiography makes worse law*, 74 Iowa L R 303, 315 (1989), quoting *An Act declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown* (The Declaration of Rights), 1 W & M, sess 2, ch 2 (1688-1689), 9 Statutes at Large 67, 69 (Pickering 1764). That the people of England intended their petitions to be immune from all penalty seems unquestionable in light of the textual language of the 1689 Declaration of Rights, particularity given the English people's awareness of the *Seven Bishops* case and the historical events it prompted.[2]

Thus, *Lake,* the dispositive inquiry in *Seven Bishops* regarding whether the defendants' speech was in petition form, and the historical effect of *Seven Bishops* are instructive about the scope and meaning of the petition right before 1791. First, they crystalize the common-law understanding in late seventeenth-century England that speech was absolutely immune when made in petition form. Second, the historical role that *Seven Bishops* had in inducing the creation of the English Bill

---

[2]Defense counsel in *Seven Bishops* proclaimed to the Court that the dispute was "a case of the greatest consequence that ever was in Westminster-hall . . . or in this court." *Seven Bishops, supra* at 239.

of Rights (Declaration of Rights) and the explicit inclusion of the right to petition in the English Bill of Rights immediately following the *Seven Bishops* decision reinforce the foundational understanding of the importance and full scope of the right to petition.  Finally, the elementary distinctions maintained between the freedoms of speech and press and the right to petition in the seventeenth century is evident in *Lake* and *Seven Bishops*, where the outcomes were influenced by whether the defendants' statements were made while petitioning because the same subject matter spoken outside the petitioning activity was not protected.  Smith, *supra* at 1177, 1180.

"The American colonies adopted and adapted the right to petition from petition's English precursors." Mark, *The vestigal constitution: The history and significance of the right to petition*, 66 Fordham L R 2153, 2161 (1998).  "In no case did the colonial affirmation of the right narrow the English right."  *Id.* at 2175.  Indeed, our Declaration of Independence is the most famous example of the colonists' commonplace use of petitioning as a recognized political right:

> We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury.

Following the drafting of the Constitution in 1787 and its ratification in 1789, it became clear that the Anti-

Federalists would demand amendments to the Constitution to assure the continued protection of the well-understood natural rights that a self-governing people do not forfeit to their government. Mark, *supra* at 2207. Regarding consideration of the petition right, what arose was a focus on the role of the petition right in the new national governmental experiment and, more directly, an exhaustive dialogue regarding whether any petitioning should be accompanied by the power to *instruct* the people's representatives. Instruction was ultimately rejected.

No discussion is recorded that challenged the protective scope of the petition right recognized under English law and practiced in the colonies, including the protection from defamation under the case law of *Seven Bishops* and *Lake*. Schnapper, *supra* at 345 (1989) (stating that "there is absolutely no contemporaneous history suggesting that anyone connected with the framing and approval of the petition clause harbored any objection to or intended any limitation on the right to petition as it had existed under English law prior to the Revolution and as it continued in the several states."). Accordingly, the lack of any discussion regarding limiting the petition right as it was understood at that time undoubtedly suggests that the Petition Clause that was ratified as a part of the First Amendment, *in 1791*, embodied the same petition

right present in the English Bill of Rights and freely practiced in colonial America.

In fact, even codified qualifications on the petition right found in several colonial and early state declarations of rights were not included in the First Amendment Petition Clause.[3] Smith, *supra* at 1181-1182. Without textual references in the Petition Clause itself suggesting otherwise, and the rejection in the adopted Petition Clause of any of the minor qualifications that were prescribed by individual colonies and states, the compelling conclusion is that the First Amendment drafters and ratifiers intended the broad petition protection that had been recognized in England and practiced in the colonies.

This conclusion is fortified by the contentious debate that occurred regarding the lack of a Bill of Rights in the original Constitution. Bowen, *Miracle at Philadelphia* (Boston: Atlantic-Little Brown, 1966), ch XXI, pp 243-253. Anti-Federalists were astounded that the proposed Constitution failed to expressly protect the rights of free people that

---

[3]While there existed a few qualifications on the form and manner of presentation of petitions that were unique to individual colonial states, none addressed defamation. Several colonies and states required that a petition be submitted in an "orderly and peaceable manner." Smith, *supra* at 1181-1182. This requirement was consistent with statutory requirements that accompanied the English Bill of Rights, but it did not concern the content of the petition.

dated back to the Magna Carta. *Id.* at 245; *The Federalist* (New York: Barnes & Nobel, Wright ed, 1996), p 15. The Federalist response was not, however, that these rights should not be protected or should be protected differently than they had been in the past. Rather, the Federalists advanced, inter alia, that the rights of man were so well established and understood that the listing of them was not only unnecessary, as the federal government could not touch them, but *dangerous* inasmuch as it would be impossible to list all the natural rights of man. Hamilton, *Federalist No 84* (available at Wright ed, *supra* at 535); Bowen*, supra* at 245.

Therefore, the 1787-1789 debate whether to include a bill of rights in the Constitution reveals that neither the Federalists nor Anti-Federalists questioned the vitality of the various rights specifically proposed to be listed in such a bill of rights, rights that were eventually adopted in 1791. Rather, these rights were admitted to exist and be preserved as rights natural to all men in the new Constitution, and the debate on these rights concerned only whether they should be constitutionally codified. Accordingly, this 1787-1789 discussion of the rights that were eventually incorporated as the Bill of Rights in 1791 is persuasive support for the proposition that the drafters and ratifiers of the Petition Clause clearly understood what the petition right meant: what

it had always meant.

In colonial America, two characteristics of the petition right further disclose the broad reach and distinctive role the right was understood to have in our new republic.  First, just as the petition right protected the king's subjects in England from prosecution for libel, petitioning was available in America to the enfranchised as well as the disenfranchised.  Petitioning was apparently one of the few mechanisms by which the disenfranchised joined the enfranchised in the political life of colonial America.  Mark, *supra* at 2169-2170.  In fact, the right to petition was considered so fundamental to the operation of government that in documented cases "women, free blacks, and even slaves, were allowed to petition" in colonial America, as were prisoners.  Smith, *supra* at 1172; see also Mark, *supra* at 2181-2184 (citing Bailey, *Popular Influence Upon Public Policy: Petitioning in Eighteenth Century Virginia* [Westport, CT: Greenwood Press, 1979], pp 43-46).[4]

This broad availability of the right of petitioning government was contemporaneous with explicit statutory limitations on freedom of speech and press that were enacted

---

[4]At least in colonial Virginia, the right to petition was not limited by class, sex, or race.  Bailey, *supra* at 43. In fact, Bailey documents that after the Virginia legislature was given authority over the manumission of slaves in 1776, petitions increased from blacks both free and enslaved.  *Id.* at 44.

and practiced in colonial America. Smith, *supra* at 1171 (discussing licensing of the press and punishment for offensive political speech in Massachusetts, Pennsylvania, and New York as late as the early 1720s); see also Garry, The American Vision of a Free Press (1990). "Seditious libel laws existed in all of the colonies, and punishment for statements critical of the government was an accepted, lawful practice which continued even after the framing and ratification of the First Amendment." Spanbauer, *The First Amendment right to petition government for a redress of grievances: Cut from a different cloth*, 21 Hastings Const L Q 15, 37 (1993). Yet, the presentation of a petition to the government was not considered a "publication" under the libel laws in both England and colonial America. *Id.* at 38; see also Clar, Comment, *Martin v City of Del City: A lost opportunity to restore the First Amendment right to petition,* 74 St John's L R 483 (2000).

In addition, while there is a clear indication that the First Amendment drafters rejected the idea that the people could "instruct" their representatives, the understanding of the petition right in 1787 was that petitioning was such an influential force in the idea of self-government that it included the right to consideration and response. Mark, *supra* at 2204-2212. In other words, the filing of a petition with

the government entitled the petitioner to legislative consideration of the petition, as well as a legislative response to the petition.

Interestingly, one of the most powerful indications of the breadth of, and political importance attached to, the right of petition in the early days of the United States occurred within its first years of founding and immediately before the adoption of the Bill of Rights.  The filing of the Quaker petitions in the 1st Congress in 1790, concerning demands for ending the practice of slavery, occasioned what many congressional members considered a constitutional crisis that might destroy the fragile new national government. See Ellis, *Founding Brothers* (New York: Knopf, 2000), ch 3, pp 81-119.  What is remarkable for constitutional analysis is not that such politically and constitutionally explosive petitions were filed, but why the petitions were not simply ignored by America's new Congress and why none of the Quaker petitioners was threatened with prosecution for defamation or sedition.

It is well understood that one of the significant constitutional compromises that was struck in order to gain approval within the Constitutional Convention (and eventually among the colonies that were to adopt the proposed constitution) was the Sectional Compromise.  The question of how to address the slavery issue in a national government

15

proved to be impossible for the drafters to wholly resolve. *Ellis, supra* at 85-86. Consequently, the Sectional Compromise placed the issue of the slave trade beyond the powers of the federal government until 1808, by adding article I, § 9, cl 1, to the Constitution.[5] Ellis, *supra* at 85-86. It was believed that by thus placing the importation-of-slaves question beyond congressional reach the issue of slavery would not raise its divisive and insoluble head, at least in the early days of the Union. Bowen, *supra* at 200-204. However, the founders and ratifiers who so believed had not reckoned on the passionate abolitionist Quakers of the Northeast who well understood and would exercise their right to petition. Ellis, *supra* at 81.

Notwithstanding clause 1 of article I, § 9, upon receipt of the Quaker petitions, one personally endorsed by Benjamin Franklin, the 1st Congress was immediately convulsed over how to proceed. *Id.* at 81-119. There was much debate about whether the Quaker petitions should be read in the House chamber because of their potential to rekindle a question the drafters of the Constitution, a number of whom were members of the 1st Congress, were unable to resolve other than by

---

[5]"The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person." US Const, art I, § 9, cl 1.

16

constitutionally deferring its consideration for twenty years. Ellis, *supra.* Eventually, the Congress resolved to refer the Quaker petitions to a special committee for a more private consideration. Thereafter, the 1st Congress adopted a resolution *permanently* precluding the consideration of the slavery question.[6] *Id.*

Again, even given the constitutional crisis that the Quaker petitions posed for the new national government, the remarkable thing about this historic episode is that there does not appear to be any indication that the 1st Congress believed it could simply ignore the petitions, despite Article I, § 9, cl 1. More important, *these petitioners were not prosecuted for what at least the southern members of Congress undoubtedly considered libelous, seditious statements.*

2. The Text of the Petition Clause

As a textual matter, I note that although the United States Supreme Court has stated that all the First Amendment

---

[6]A good deal of the congressional time and activity was devoted to the debate on the Quaker petitions, with veiled threats of secession made by southern members of Congress if any aspect of slave practices were disturbed by the federal legislature. Ellis, *supra.* Eventually, by resolution, the 1st Congress adopted an amended recommendation of the committee formed to consider the Quaker petitions. *Ellis, supra* at 118 (citing De Pauw, 3 *Documentary History of the First Federal Congress of the United States* [Baltimore: John Hopkins Univ Press, 1972], p 341). That resolution forbade not only congressional consideration of the issue of slavery until 1808, but banned its consideration forever. *Ellis, supra* at 118.

rights are cut from the same cloth, *McDonald v Smith, supra* at 482, the clauses are nonetheless distinct in their natures.[7] The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Inasmuch as the First Amendment protects the "freedom *of* speech," the word "speech" has often been dissected in order to determine what constitutes speech. In this pursuit, the United States Supreme Court has often focused on the *subject* of the speech. See, e.g., *Miller v California,* 413 US 15; 93 S Ct 2607; 37 L Ed 2d 419 (1973) (obscenity); *Virginia State Bd of Pharmacy v Virginia Citizens Consumer Council, Inc,* 425 US 748; 96 S Ct 1817; 48 L Ed 2d 346 (1976) (commercial speech); *Chaplinsky v New Hampshire*, 315 US 568; 62 S Ct 766;

---

[7]At the least, the presentation of the Petition Clause as one separate from the clauses concerning freedom of speech in the First Amendment alerts us textually that the purpose and intent of the Petition Clause must be distinct from its sibling clauses. Higginson, *A short history of the right to petition government for the redress of grievances,* 96 Yale L J 142, 155-156 (1986). Further, I note that whereas the Free Speech Clause and the Free Press Clause are separated by a comma, both are separated from the Petition Clause by a semi-colon. See Kesavan & Paulsen, *Is West Virginia constitutional?*, 90 Cal L R 291, 334-352 (2002) (discussing, inter alia, the interpretation of the sixty-five semi-colons contained in the original constitution, particularly the punctuation of US Const, art IV, § 3 concerning the creation of new states).

86 L Ed 1031 (1942) (fighting words); *RAV v City of St Paul*, 505 US 377; 112 S Ct 2538; 120 L Ed 2d 305 (1992) (hate speech).  In fact, case law on freedom of speech has developed a bifurcated analysis differentiating whether contested regulations on expression are "content-neutral" or "content-based." See, e.g., Tribe, American Constitutional Law (2d ed), § 12-2, pp 791-792.

However, while the text of the Free Speech Clause fairly invites an analytical focus on the *subject* of speech, the text of the Petition Clause, the right "to petition," denotes a focus not on the identity of the speaker or subject matter, but the *identity of the listener*.  The text of the First Amendment accordingly implies that where the government is the listener, the speaker's right to petition the government is at issue.

This textual distinction is not, in my opinion, without significance.  Rather, it signals the original intent of the Petition Clause to protect citizen input when presented in the form of a petition to government, regardless whether it would be considered "speech" or "press" under the sibling clauses of the First Amendment.

### 3.  Post-1791 Development

While petitioning in colonial America afforded even the disenfranchised access to the People's representatives,

19

petitioning eventually atrophied as a popular tool of self-governance at the center of our republican form of government with the increased emphasis on voting and the expansion of rights of enfranchisement in the United States.[8] Mark, *supra* at 2154, 2158-2160. Because petitioning itself has receded in its political prominence, it is not hard to understand why, especially with the enormous expansion of protections now accorded under the Free Speech Clause and the Free Press Clause during the last century, the Petition Clause has lacked apparent independent political importance in constitutional adjudication. Despite what I believe is a compelling historical and textual case for according the Petition Clause distinctive meaning,[9] by the twentieth century, the federal judiciary had all but relegated the Petition Clause to the

---

[8]See, e.g., the Fifteenth, Nineteenth, and Twenty-Sixth Amendments, which extended the right to vote to individuals regardless of race, color, or previous servitude and to women and citizens eighteen years old and older.

[9]Further, it seems illogical that the founders, wary of an overpowering and unaccountable federal government, would create immunity from defamation for governmental actors under the Speech and Debate Clause, US Const, art I, § 6, cl 1, but expose the People to defamation when petitioning. *Barr v Mateo,* 360 US 564; 79 S Ct 1335; 3 L Ed 2d 1434 (1959). Consider a mutually libelous exchange between a citizen and a congressman at a congressional hearing. While the congressman would be absolutely immune from liability because of the Speech and Debate Clause, under *McDonald*'s interpretation of the Petition Clause, the citizen would face potential liability. Such an outcome seems incompatible with the founders' understood view that the People are the masters and the government the servant.

20

status of a step-sibling without independent identity or import apart from the Free Speech Clause and the Free Press Clause of the First Amendment.  Our contemporary Petition Clause jurisprudence is thus entirely anchored in that developed under the other First Amendment clauses.  See, e.g., *McDonald, supra.*

### 4.  Resolution

Although I would adhere to the principle that a constitutional provision is to be interpreted consistently with its original understanding,[10] I acknowledge that our obligation is to follow the United States Supreme Court's interpretation of this constitutional provision.  In light of the Court's holding that absolute immunity from defamation does not exist for petition activity in *McDonald*, I accept as I must the analysis offered in my majority opinion.

---

[10]While I acknowledge that contemporary, postratification judicial interpretations of a constitutional provision could permissibly aid an effort to determine the original intent of a provision, I suggest that such consideration is misplaced where the original intent can be surmised from the preratification understanding of the provision's meaning. Inasmuch as *McDonald* essentially ignores the preratification understanding of the petition right, I find its concentration on the postratification case law insufficient and unjustified. Schnapper, *supra* (stating that *McDonald* fails "to discuss any seventeenth- or eighteenth-century materials that might reveal the contemporaneous understanding of the petition clause, but relies instead solely on postratification materials," *id.* at 305, and concluding that "[h]ad McDonald written his letter . . . to President Washington or to George III, rather than to President Reagan, a libel action by Smith would have been dismissed out of hand," *id.* at 343).

21

However, I believe the history and text of the petition right, as analyzed above, support an interpretation that the Petition Clause is distinct from its First Amendment siblings and therefore deserves consideration regarding whether distinct treatment in the constitutional law of defamation is warranted under the Petition Clause. For this reason, I believe *McDonald* was incorrectly decided.

## II. Application of the *McDonald* Principle

While I concur in the majority opinion because of the clear direction provided by *McDonald*, in addition to my original-intent analysis, I believe there are meritorious arguments for declining to extend the private-figure and public-figure defamation distinction to cases involving the right to petition. Further, the flaw of the *McDonald* principle that the First Amendment clauses are to be treated without distinction in defamation cases is exposed, in my opinion, by the extension of the private-figure and public-figure dichotomy to petition-right cases—particularly the present case.

The rationale for the private-figure and public-figure dichotomy announced in *Gertz v Robert Welch, Inc*, 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), seems potentially misplaced in petition settings where the alleged defamation damages derive from the resulting actions of the government.

*Gertz* reasoned that private individuals are more vulnerable to defamation than public figures because public figures have "significantly greater access" to the media and can use the media to counteract false statements. *Gertz, supra* at 344.[11]

It is arguable that the *Gertz* "access to the media" rationale in the free speech and free press contexts is ill-fitted to the right to petition context, particularly where a plaintiff's damages are a product of the adverse actions of government, albeit induced by a third party. Unlike falsehoods disseminated by or in the media, access to city council meetings is not similarly limited. City council meetings are generally not run so that only public figures can be heard and private figures ignored. A central purpose of a

---

[11]I recognize that *Gertz* also opined that public figures deserve less protection against defamation because they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood[s]," *Gertz, supra* at 345, unlike private persons. While this reasoning would appear to provide an alternative *Gertz*-based avenue for extending the private-figure and public-figure dichotomy to the Petition Clause, I suggest that this rationale is also perhaps misplaced in a petition setting like the present one.

Although it is well established in the case law on freedoms of speech and press that a private figure who throws himself into a public dispute can become a limited purpose public figure for defamation qualified immunity purposes, *Gertz, supra* at 351, plaintiff in this case petitioned the city council to award him a public contract. It appears questionable to me that one who invites comment from his fellow citizens by petitioning the government on a public issue, seeking the fruits of a taxpayer-funded construction project, remains a private figure.

23

public meeting of the city council is to allow citizenry input and to maximize the exposure of the government's decision-making in an open meeting.

In fact, the access to respond to defamatory statements in a petition context is evident in the present case, where plaintiff was given the opportunity at the city council meeting to answer defendant's assertions. Further, the Petition Clause itself protected plaintiff's right to deliver a written petition to the city council in order to answer the defamatory statements made by defendant. For these reasons, it is questionable whether the rationale for the private-figure and public-figure dichotomy announced in *Gertz*, and applied in defamation actions involving freedom of speech or freedom of press, provides a solid foundation for the private-figure and public-figure standard in the right to petition context. This extension is particularly questionable where the damages are a result of a decision made by the listener, a city council, to which both plaintiff and defendant have constitutionally guaranteed access under the Petition Clause.

### III. Conclusion

An analysis of the original understanding of the Petition Clause leads to the conclusion that *McDonald* was incorrectly decided. Consistent with its preratification history and its text, I believe that the Petition Clause offers protections

distinct from its sibling clauses under the First Amendment and that the defendant union representative's statements were absolutely immune from defamation liability.

However, *McDonald* provides this Court with clear direction about whether the private-figure and public-figure dichotomy of free speech and free press defamation law is to be extended to petition right defamation cases. As this Court is bound by *McDonald* because of the Supremacy Clause of the United States Constitution,[12] I reluctantly but obediently agree with the analysis set forth in my majority opinion.

Robert P. Young, Jr.

---

[12]US Const, art VI, cl 2.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT


J & J CONSTRUCTION CO,

    Plaintiff-Appellant,

v                                      No. 119357

BRICKLAYERS AND ALLIED CRAFTSMEN,
LOCAL 1 and MARK KING, jointly and
severally,

    Defendants-Appellees.

_____

CAVANAGH, J. (*dissenting*).

    I agree with the majority's observation that the United States Supreme Court has never been squarely presented with the question whether the public-figure and private-figure dichotomy embodied in the case law on defamation involving First Amendment's Free Speech Clause and Free Press Clause should extend to defamation cases involving the Petition Clause. However, I disagree with the majority's conclusion that *McDonald v Smith*, 472 US 479; 105 S Ct 2787; 86 L Ed 2d 384 (1985), requires application of the public-figure and private-figure dichotomy to Petition Clause defamation cases.

While, arguably, *McDonald* may allow application of the dichotomy to Petition Clause defamation cases, it certainly does not require it. Further, the principles expressed by our high court do not support the majority's conclusion. Because I do not agree with the majority's assertion that *McDonald* forces states to import the public-figure and private-figure dichotomy to Petition Clause defamation cases, and because I recognize the historical significance of the Petition Clause, as well as the fact that the text and structure of the Petition Clause in the Michigan Constitution differ from the text and structure of the First Amendment of the United States Constitution, I respectfully dissent. I would ask the parties for additional briefing regarding the effect of the Petition Clause in the Michigan Constitution.

## I. THE PETITION CLAUSE: IS THERE A PUBLIC-FIGURE VERSUS PRIVATE-FIGURE DISTINCTION?

The majority acknowledges that the defamation action in *McDonald* was brought pursuant to North Carolina's common law, which requires a showing of "actual malice" to recover for defamation, regardless of whether the plaintiff is a public or a private figure.[1]  The majority concludes that this

---

[1] Plaintiff's cause of action in this case, by contrast, arises under Michigan's defamation statute, MCL 600.2911(7), which provides:

> An action for libel or slander shall not be
> (continued...)

2

application of state law by the United States Supreme Court "strongly signaled its view that all Free Speech Clause and Free Press Clause defamation doctrine developed in the past forty years is to be imported without change to constitutional adjudications arising under the Petition Clause"[2] and rejects an alternative interpretation, instead relying on *Arkansas v Sullivan*, 532 US 769; 121 S Ct 1876; 149 L Ed 2d 994 (2001). The majority states:

> In interpreting the *federal* constitution, state courts are not privileged to provide greater protections or restrictions when the Supreme Court of the United States has refrained from doing so. [*Ante* at 11 n 9.]

In *Sullivan,* the United States Supreme Court reversed the Arkansas Supreme Court's holding that it was free to interpret the United States Constitution to provide greater protection than United States Supreme Court federal constitutional precedent provides. The *Sullivan* Court noted that such a possibility was foreclosed by *Oregon v Hass*, 420 US 714; 95 S Ct 1215, 43 L Ed 2d 570 (1975):

> We reiterated in *Hass* that while "a State is

---

[1](...continued)
brought based upon a communication involving a private individual unless the defamatory falsehood concerns the private individual and was published negligently. Recovery under this provision shall be limited to economic damages including attorney fees.

[2] *Ante* at 10.

3

free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards," it "may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them." [*Sullivan* at 772, quoting *Hass* at 719 (emphasis in original).]

The majority's reliance on *Sullivan* is misplaced for two reasons. First, requiring all plaintiffs to prove that defamatory statements were made with actual malice in Petition Clause defamation cases would not impose a "greater restriction" than that imposed by the United States Supreme Court in *McDonald*. In fact, it would apply the same standard utilized by the Court in *McDonald*. The majority's reliance on *Sullivan* is also misplaced because the United States Supreme Court has not "specifically refrained" from applying the actual-malice standard to private-figure plaintiffs in Petition Clause defamation claims. This remains, as acknowledged by the majority, a question not yet decided by the United States Supreme Court.

Further, in *McDonald,* the United States Supreme Court held that the right to petition should be accorded *no greater protection* than other First Amendment expressions, inasmuch as absolute immunity was held inappropriate. *McDonald* did not hold that the right to petition was limited to *the same protection* as the rights to free speech and free press. The

4

Court did not indicate a clear intent to import the veritable plethora of jurisprudence surrounding the rights to free speech and free press into Petition Clause defamation.

Moreover, the principles articulated in *McDonald* do not support the interpretation employed by the majority.  The question the Court was presented with in *McDonald* was

> whether the Petition Clause of the First Amendment provides absolute immunity to a defendant charged with expressing libelous and  damaging falsehoods in letters to the President of the United States. [*McDonald* at 480.]

The Court repeatedly examined the claim of absolute immunity in light of the actual-malice standard.  Reviewing early state libel cases, the *McDonald* Court determined that there were conflicting views of the privilege afforded petitioners: some states afforded petitioners absolute immunity, while others allowed recovery for petitioning activity performed "maliciously, wantonly, and without probable cause . . . ." *Id*. at 483, quoting, *Gray v Pentland*, 2 Serg & R 23 (Penn, 1815).  The *McDonald* Court also noted that in *White v Nicholls*, 44 US (3 How) 266; 11 L Ed 591 (1845), it did not recognize an absolute privilege, rather it concluded that "the defendant's petition was actionable if prompted by 'express malice . . . .'" *McDonald* at 484.  The *McDonald* opinion does not mention negligence; it simply holds that there is not absolute immunity for Petition Clause

5

defamation.

As scholars have noted:

> The text [of *McDonald*] merely requires proof
> of actual malice 'defined...in terms...consistent
> with *New York Times v. Sullivan.*' If the Court had
> intended to establish the entire public/private
> figure [dichotomy] for Petition Clause [defamation]
> cases, [it] would have discussed *Gertz v Robert
> Welch, Inc*. [Gary, *First Amendment Petition Clause
> immunity from tort suits: In search of a consistent
> doctrinal framework*, 33 Idaho L R 67, 110
> (1996)(citations omitted).]

*McDonald* is more commonly interpreted as employing the

actual-malice standard of *New York Times Co v Sullivan*, 376 US

254; 84 S Ct 710; 11 L Ed 2d 686 (1964); to interpret *McDonald*

as incorporating the public-figure and private-figure

dichotomy is a misreading of the case. *Gary* at 109; see also,

4 Rotunda & Nowak, Treatise on Constitutional Law (3d ed),

§ 20.53, p 690 n 3 (The Petition Clause does not require state

libel law to expand the qualified privilege already afforded

by *New York Times.*).

Justice Brennan's concurrence in *McDonald* provides useful

insight, he stated:

> There is no persuasive reason for according
> greater or lesser protection to expression on
> matters of public importance depending on whether
> the expression consists of speaking to neighbors
> across the backyard fence, publishing an editorial
> in the local newspaper, or sending a letter to the
> President of the United States. It necessarily
> follows that expression falling within the scope of
> the Petition Clause, while fully protected by the
> actual-malice standard set forth in *New York Times*

6

*Co v Sullivan*, is not shielded by an absolute privilege. [*McDonald* at 490.]

"This forceful statement suggests that actual malice is the standard for petitioning activity, regardless of the status of the plaintiff." Gary at 112.

Thus, while it is clear that the United States Supreme Court intended that a defendant claiming immunity from defamation on the basis of the Petition Clause not be afforded absolute immunity, it is not at all clear that the Court intended the qualified immunity to apply differently depending on whether the plaintiff is a public or a private figure. The majority's assertion that *McDonald requires* the states to import the public-figure and private-figure dichotomy applicable in free-speech and free-press cases is simply not supported by a careful reading of that case.

## II. MICHIGAN'S PETITION CLAUSE

While I recognize the principles underlying, and the historical significance of, the Petition Clause, as outlined by Justice Young in his concurring opinion, I am reluctant to question the wisdom of the United States Supreme Court in interpreting the federal constitution. However, on the basis of the principles noted in Justice Young's concurring opinion, I think the bench and bar in this state would benefit from a thorough analysis of the protections afforded petitioners under the Michigan Constitution. Because this Court was not

7

presented with such an analysis, I would request additional briefing from the parties.

Notably, the structure of Const 1963 differs from the federal constitution. Each right included in the federal constitution's First Amendment is expressed as a separate clause in Const 1963, art 1, the Declaration of Rights. Const 1963, art 1, in pertinent part, provides:

> Sec 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

> Sec 3. The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances.

> Sec. 4. Every person shall be at liberty to worship God according to the dictates of his own conscience. . . .

> Sec. 5. Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.

By contrast, the First Amendment to the federal constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. [US Const, Am I.]

8

Because *McDonald*'s determination that the rights to free speech and free press and the right to petition were inseparable was based on the structure of the Petition Clause, and because the structure of Michigan's Petition Clause is decidedly different from the federal clause, I would inquire whether the framers of the Michigan Constitution intended to afford greater protection to petitioners by creating a distinct clause. Because this issue was not briefed by the parties, and, thus, is not properly before the Court, I would ask the parties for further briefing on the issue.

### III.  CONCLUSION

I do not agree with the majority that *McDonald* requires states to impose the public-figure and private-figure dichotomy when deciding Petition Clause defamation cases. Further, *McDonald* can be and has been interpreted as establishing that, whenever the right to petition is exercised, that right is afforded the protection of the actual-malice standard. Because I believe it may be significant that the text and structure of Michigan's Petition Clause differs from the federal constitution's First Amendment and because I recognize the historical significance of the right to petition in a democratic society, I would request additional briefing.

> Michael F. Cavanagh
> Marilyn Kelly

**9**